# United States Court of Appeals
## For the First Circuit

No. 01-1296

IAIN FRASER; STEVE TRITTSCHUH; SEAN BOWERS;
MARK SEMIOLI; RHETT HARTY; DAVID SCOTT VAUDREUIL;
MARK DODD; and MARK DOUGHERTY,

Plaintiffs, Appellants,

v.

MAJOR LEAGUE SOCCER, L.L.C.; KRAFT SOCCER, L.P.;
ANSCHUTZ SOCCER, INC.; ANSCHUTZ CHICAGO SOCCER, INC.;
SOUTH FLORIDA SOCCER, L.L.C.; TEAM COLUMBUS SOCCER, L.L.C.;
TEAM KANSAS CITY SOCCER, L.L.C.; LOS ANGELES SOCCER PARTNERS,
L.P.; EMPIRE SOCCER CLUB, L.P.; WASHINGTON SOCCER, L.P.;
and UNITED STATES SOCCER FEDERATION, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,

Coffin, Senior Circuit Judge,

and Woodlock,[*] District Judge.

Jeffrey L. Kessler with whom James W. Quinn, Bruce S. Meyer, Michael A. Rona, Allan L. Garcia, Tamir M. Young, Weil, Gotshal & Manges LLP, Paul B. Galvani, Ropes & Gray and Richard A. Berthelsen were on brief for appellants.
Michael A. Cardoza with whom Steven C. Krane, Lee M. Goldsmith, Brooke H. Spigler, Daniel L. Goldberg, Daniel S. Savrin and Bingham Dana LLP were on brief for appellees Major League Soccer, L.L.C., et al.

---

[*]Of the District of Massachusetts, sitting by designation.

John Paul Robbins with whom McLaughlin & Stern, LLP and Morgan, Brown & Joy were on brief for appellee United States Soccer Federation, Inc.

---

March 20, 2002

---

BOUDIN, Chief Judge. Professional soccer players sued Major League Soccer, LLC ("MLS"), nine independent operator/investors in MLS, and the United States Soccer Federation, Inc. ("USSF"), alleging violations of Sherman Act sections 1 and 2, 15 U.S.C. §§ 1-2, and Clayton Act section 7, id. § 18, and seeking injunctive relief and monetary damages.[1] The district court granted summary judgment for defendants on the section 1 and Clayton Act counts. After a twelve-week long trial on the section 2 count, the jury returned a special verdict leading to judgment in favor of defendants. Players now appeal the disposition of all three counts. We begin with a statement of the background facts.

I.  BACKGROUND FACTS

Despite professional soccer's popularity abroad, the sport has achieved only limited success in this country. Several minor leagues have operated here (four such leagues exist today), but before the formation of MLS, only one other U.S. professional league--the North American Soccer League ("NASL")--had ever obtained Division I, or top-tier, status. Launched in 1968, the NASL achieved some success before folding in 1985; MLS attributes the NASL's demise in part to wide disparities in the financial resources of the league's independently owned teams and a lack of centralized control.

---

[1]The plaintiffs comprise eight named MLS players and a certified injunctive class of 600 past, present, and future MLS players. The operator/investors named in the suit include: Kraft Soccer, LP; Anschutz Soccer, Inc.; Anschutz Chicago Soccer, Inc.; South Florida Soccer, LLC; Team Columbus Soccer, LLC; Team Kansas City Soccer, LLC; Los Angeles Soccer Partners, LP; Empire Soccer Club, LP; and Washington Soccer, LP.

In 1988, the USSF, the national governing body of soccer in the United States, 36 U.S.C. § 220501 et seq., was awarded the right to host the 1994 World Cup soccer tournament in the U.S. by the Federation Internationale de Football Association ("FIFA"), soccer's international governing body.  In consideration for the coveted sponsorship rights, the USSF promised to establish a viable Division I professional soccer league in the U.S. as soon as possible.

The USSF decided as early as 1988 to sanction only one Division I professional league.  The concern was that sanctioning rival leagues would dilute revenues, drive up costs, and thereby dim the long-term prospects for Division I soccer in the U.S.  Indeed, MLS contends no other country has sanctioned more than one Division I league within its borders, although arrangements in other countries could be variously described.

Just before World Cup USA play began, in early December 1993, three organizations presented competing plans to develop a Division I professional soccer league to the USSF National Board of Directors.  The three competing organizers were: League One America; the American Professional Soccer League ("APSL"), an existing Division II league; and Major League Professional Soccer ("MLPS"), the precursor to MLS, headed by the USSF's own president, Alan Rothenberg.

At its December 5, 1993, meeting the USSF board tentatively selected MLPS as the exclusive Division I professional soccer league in the U.S., based upon its relatively strong

capitalization, higher proposed spending, business plan and management. The board also reaffirmed its intention to sanction only one Division I league. But in January 1995, the USSF announced that it would consider sanctioning additional leagues which could meet rigorous new financial and operating standards beginning with the 1998 season.

In the wake of a successful World Cup USA, MLS was officially formed in February 1995 as a limited liability company ("LLC") under Delaware law. The league is owned by a number of independent investors (a mix of corporations, partnerships, and one individual) and is governed by a management committee known as the board of governors. Some of the investors are passive; others are also team operators as explained below.

MLS has, to say the least, a unique structure, even for a sports league. MLS retains significant centralized control over both league and individual team operations. MLS owns all of the teams that play in the league (a total of 12 prior to the start of 2002), as well as all intellectual property rights, tickets, supplied equipment, and broadcast rights. MLS sets the teams' schedules; negotiates all stadium leases and assumes all related liabilities; pays the salaries of referees and other league personnel; and supplies certain equipment.

At issue in this case is MLS's control over player employment. MLS has the "sole responsibility for negotiating and entering into agreements with, and for compensating, Players." In a nutshell, MLS recruits the players, negotiates their salaries,

pays them from league funds, and, to a large extent, determines where each of them will play. For example, to balance talent among teams, it decides, with the non-binding input of team operators, where certain of the league's "marquee" players will play.

However, MLS has also relinquished some control over team operations to certain investors. MLS contracts with these investors to operate nine of the league's teams (the league runs the other three). These investors are referred to as operator/investors and are the co-defendants in this action. Each operator/investor has the "exclusive right and obligation to provide Management Services for a Team within its Home Territory" and is given some leeway in running the team and reaping the potential benefits therefrom.

Specifically, the operator/investors hire, at their own expense and discretion, local staff (including the general managers and coaches of their respective teams), and are responsible for local office expenses, local promotional costs for home games, and one-half the stadium rent (the same portion as MLS). In addition, they license local broadcast rights, sell home tickets, and conduct all local marketing on behalf of MLS; agreements regarding these matters do not require the prior approval of MLS. And they control a majority of the seats on MLS's board, the very same body which runs the league's operations. Among other things, the board is responsible for hiring the commissioner and approving national television contracts and marketing decisions, league rules and policies (including team player budgets), and sales of interests.

-6-

The operator/investors also play a limited role in selecting players for their respective teams. While the operating agreements provide that the operator/investors will not bid independently for players against MLS, they may trade players with other MLS teams and select players in the league's draft. Such transactions, however, must follow strict rules established by the league. Most importantly, no team may exceed the maximum player budget established by the management committee.

In return for the services of the operator/investors, MLS pays each of them a "management fee" that corresponds (in large part) to the performance of their respective team. The management fee equals the sum of one-half of local ticket receipts and concessions; the first $1,125,000 of local broadcast revenues, increasing annually by a percentage rate, plus a 30% share (declining to 10% by 2006) of any amount above the base amount; all revenues from overseas tours; a share of one-half the net revenues from the MLS Championship Game and a share of revenues from other exhibition games.

The remaining revenues of the league are distributed in equal portions to all investors. Thus, while the investors qua investors share equally in the league's profits and losses, the individual team operators qua operators fare differently depending at least in part on the financial performance of their respective teams. It bears mentioning, however, that neither the league nor, apparently, any of its teams has yet made a profit.

Although the league retains legal title to the teams, the operator/investors may transfer their operating rights, within certain limits, and retain much of the value created by their individual efforts and investments. Investors may transfer their ownership stakes and operating rights to other current investors without obtaining prior consent; transfers to outside investors, however, require a two-thirds majority vote of the board. For its part, MLS may terminate any operating agreement on its own initiative if, by a two-thirds vote of the board, an operator/investor is determined to have failed to act in the best interests of the league. If so, it must still pay such operator/investor fair market value for its operating rights and ownership interest.

The league began official play in 1996. The following February of 1997, eight named players sued MLS, the USSF, and the operator/investors under various antitrust theories. The injunctive class was certified in January of 1998. Fraser v. Major League Soccer, LLC, 180 F.R.D. 178 (D. Mass. 1998). In count I, the players claimed MLS and its operator/investors violated Sherman Act section 1 by agreeing not to compete for player services. In count III,[2] the players claimed MLS monopolized or attempted to monopolize, or combined or conspired with the USSF to monopolize, the market for the services of Division I professional soccer players in the U.S., in violation of Sherman Act section 2, by

_____

[2]Count II, a challenge to FIFA's transfer fee policies, and a state law contract claim were severed and stayed pending final resolution of this appeal.

preventing any other entity from being sanctioned as a Division I professional soccer league in the United States or otherwise competing against MLS. In count IV, the players claimed that the combination of assets of the operator/investors in MLS substantially lessened competition and tended to create monopoly in violation of Clayton Act section 7.

In February 1998, before the close of discovery, MLS and its operator/investors moved for summary judgment on counts I and IV; players cross-moved, seeking to block MLS from asserting a single entity defense on count I. On April 19, 2000, the district court granted MLS summary judgment on both counts, holding that MLS and its operator/investors comprised a single entity and as such, could not conspire in violation of section 1. Fraser v. Major League Soccer, LLC, 97 F. Supp. 2d 130, 135-39 (D. Mass. 2000). On the section 7 claim, the court held that the creation of MLS "did not reduce competition in an existing market because when the company was formed there was no active market for Division I professional soccer in the United States." Id. at 141.

Subsequently, at a June 2000 status conference on the remaining section 2 claims, players indicated (apparently for the first time) that they intended to introduce evidence that MLS prohibited all competition for players among the MLS operators/investors as part of their section 2 claim as well. The court, however, prohibited players from introducing evidence on the operation of MLS--except to the extent it provided the jury with useful background information--finding this version of players'

monopoly conduct argument precluded by its earlier section 1 summary judgment decision.

A three-month jury trial commenced in September 2000 on players' remaining section 2 claims.  At the close of evidence, the court dismissed the section 2 claims against the operator/investors, and that ruling is not appealed now, leaving only MLS and the USSF as defendants.  Fed. R. Civ. P. 50.  The court then submitted a 15-question special verdict form to the jury.  On December 11, 2000, the jury returned its verdict after answering only the first two questions.  It found that players had failed to prove what they had alleged, namely, that the relevant geographic market is the United States and that the relevant product market is limited to Division I professional soccer players.  The court thereafter entered judgment dismissing count III and denied players' Rule 50 motions.  Players then filed this appeal.

II.  SHERMAN ACT SECTION 1

Some have urged that sports leagues in general be treated as single entities--individual sports teams, after all, must collaborate to produce a product.  Cf. Chicago Prof'l Sports Ltd. P'ship v. NBA, 95 F.3d 593, 599-600 (7th Cir. 1996); NFL v. N. Am. Soccer League, 459 U.S. 1074 (1982) (Rehnquist, J., dissenting from the denial of certiorari).  However, this approach has not been adopted in this circuit, Sullivan v. NFL, 34 F.3d 1091, 1099 (1st Cir. 1994), and we must work with the framework of existing circuit

law.  Single entity status for ordinarily organized leagues has been rejected in several other circuits as well.[3]

Even so, the district court concluded that under Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), MLS and its operator/investors were uniquely integrated and did comprise a single entity.  Copperweld established that a parent and its wholly owned subsidiary are not subject to attack under section 1 for agreements between them.  They are treated for section 1 purposes as a single economic actor.  But what the Supreme Court has never decided is how far Copperweld applies to more complex entities and arrangements that involve a high degree of corporate and economic integration but less than that existing in Copperweld itself.

While MLS defends the district court's single entity ruling, players say that this view is form over substance and the substance is simply a conspiracy among de facto team owners to fix player salaries, which they claim to be a per se violation of the antitrust laws.  We disagree completely with this latter characterization.  We also find that the case for applying single entity status to MLS and its operator/investors has not been established but that in this case the jury verdict makes a remand on the section 1 claim unnecessary.

---

[3]E.g., Los Angeles Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1388-90 (9th Cir. 1984); N. Am. Soccer League v. NFL, 670 F.2d 1249, 1256-58 (2d Cir. 1982); Smith v. Pro Football, Inc., 593 F.2d 1173, 1185-86 (D.C. Cir. 1978); Mackey v. NFL, 543 F.2d 606, 620 (8th Cir. 1976).

If ordinary investors decided to set up a company that would own and manage all of the teams in a league, it is hard to see why this arrangement would fall outside Copperweld's safe harbor. Certainly the potential for competition within the firm is not enough: after all, a railroad could in theory provide alternative routes between the same cities and a grocery could locate competing branches of its chain quite near one another; yet no law requires competition within a company. It is common practice, but hardly essential, that the teams in a sports league have independent owner/managers.

Further, MLS is manifestly more than an arrangement for individual operator/investors by which they can cap player salaries. In many ways, MLS does resemble an ordinary company: it owns substantial assets (teams, player contracts, stadium rights, intellectual property) critical to the performance of the league; a substantial portion of generated revenues belongs to it and is to be shared conventionally with both operator/investors and passive investors. And the fact that MLS was structured with the aim of achieving results that might not otherwise be possible does not automatically condemn it.

Focusing on the operator/investors' role as stockholders, the district court stressed that both sides of the supposed conspiracy were parts of the same corporate entity; and it noted that "unlike MLS, NFL football clubs do not exist as part of an overarching corporate structure." Fraser, 97 F. Supp. 2d at 138 n.10. And, as Copperweld itself shows, its protection is not lost

-12-

merely because there are separate legal entities--here, the operator/investors--or because one posits arrangements between them and MLS that could not be made by existing competitors without violating the antitrust laws.

Nevertheless, it is hard to treat the corporate integration as conclusive. The challenge here is primarily to the operator/investors' role as team managers, not as ordinary stockholders, and to restrictions imposed on them in that role preventing competition for player services. That a stockholder may be insulated by Copperweld when making ordinary governance decisions does not mean automatic protection when the stockholder is also an entrepreneur separately contracting with the company.[4] Above all, there are functional differences between this case and Copperweld that are significant for antitrust policy.

First, there is a diversity of entrepreneurial interests that goes well beyond the ordinary company. MLS and its operator/investors have separate contractual relationships giving the operator/investors rights that take them part way along the path to ordinary sports team owners: they do some independent hiring and make out-of-pocket investments in their own teams; they retain a large portion of the revenues from the activities of their teams; and each has limited sale rights in its own team that relate

_____

[4]Cf. Victorian House, Inc. v. Fisher Camuto Corp., 769 F.2d 466, 469-70 (8th Cir. 1985), and Greenville Publ'g Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 399-400 (4th Cir. 1974) (both cases standing for the proposition that antitrust immunity covering an action between a corporation and its agent does not extend to action of the agent acting in its own behalf).

to specific assets and not just shares in the common enterprise. One might well ask why the formal difference in corporate structure should warrant treating MLS differently than the National Football League or other traditionally structured sports leagues.

This contrasts with Copperweld's observation that the parent and its wholly owned subsidiary in that case shared a "complete unity of interests." 469 U.S. at 771. The phrase is not self-executing and, in addition, it could be taken to explain Copperweld's result without being an outer limit of the defense. Chicago Prof'l Sports, 95 F.3d at 598. Still, the existence of distinct entrepreneurial interests possessed by separate legal entities distinguishes Copperweld; it further indicates that certain functions have already been disaggregated and assigned to different entities; and it makes the potential for actual competition closer to feasible realization.

Second, in this case the analogy to a single entity is weakened, and the resemblance to a collaborative venture strengthened, by the fact that the operator/investors are not mere servants of MLS; effectively, they control it, having the majority of votes on the managing board. The problem is especially serious where, as here, the stockholders are themselves potential competitors with MLS and with each other. Here, it is MLS that has two roles: one as an entrepreneur with its own assets and revenues; the other (arguably) as a nominally vertical device for producing horizontal coordination, i.e., limiting competition among operator/investors.

-14-

From the standpoint of antitrust policy, this prospect of horizontal coordination among the operator/investors through a common entity is a distinct concern. Whatever efficiencies may be thought likely where a single entrepreneur makes decisions for a corporate entity (or set of connected entities), the presumption is relaxed--and may in some contexts be reversed--where separate entrepreneurial interests can collaborate; the fixing of above market prices by sellers is the paradigm.[5] This does not make MLS a mere front for price fixing, but it does distinguish Copperweld by introducing a further danger and a further argument for testing it under section 1's rule of reason.

To sum up, the present case is not Copperweld but presents a more doubtful situation; MLS and its operator/investors comprise a hybrid arrangement, somewhere between a single company (with or without wholly owned subsidiaries) and a cooperative arrangement between existing competitors. And, of course, there is not one kind of hybrid but a range of possibilities (imagine the operator/investors with their separate entrepreneurial interests but without their control of MLS). The question is what legal approach to take.

The law at this point could develop along either or both of two different lines. One would expand upon Copperweld to

_____

[5]A less vivid but closer parallel is a situation in which dealers or franchises, by control or coercion, make the manufacturer or franchiser impose on them restrictions that the dealers or franchisees select. See United States v. Topco Assocs., 405 U.S. 596 (1972); United States v. Sealy, 388 U.S. 350 (1967); General Leaseways v. Nat'l Truck Leasing Ass'n, 744 F.2d 588 (7th Cir. 1984); see also XII Hovenkamp, Antitrust Law ¶ 2033b (1999).

develop functional tests or criteria for shielding (or refusing to shield) such hybrids from section 1 scrutiny for intra-enterprise arrangements.  This would be a complex task and add a new layer of analysis; but where the analysis shielded the arrangement it would serve to cut off similarly difficult, intrusive scrutiny of such intra-enterprise activities under extremely generalized rule of reason standards.[6]  It would also prevent claims, clearly inappropriate in our view, under per se rules or precedents dealing with arrangements between existing independent competitors.

The other course is to reshape section 1's rule of reason toward a body of more flexible rules for interdependent multi-party enterprises.  Sports leagues are a primary example but so are common franchising arrangements and joint ventures that perform specific services for competitors (e.g., a common purchasing entity, see Northwest Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co., 472 U.S. 284 (1985)).  Certainly the trend of section 1 law has been to soften per se rules and to recognize the need for accommodation among interdependent enterprises.[7]

The same choice of approach presents itself in franchise cases.  There, too, we have a close but not complete integration of separate entities under separate entrepreneurial control.

---

[6]There is some, although not a lot of, circuit case law that looks in this direction.  City of Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 274-77 (8th Cir. 1988); see also Chicago Prof'l Sports, 95 F.3d at 598.

[7]E.g., NCAA v. Bd. of Regents, 468 U.S. 85, 100-103 (1984); McCormack v. NCAA, 845 F.2d 1338, 1344 (5th Cir. 1988); Los Angeles Mem'l Coliseum, 726 F.2d at 1387; N. Am. Soccer League, 670 F.2d at 1258-59; Smith, 593 F.2d at 1177-81; Mackey, 543 F.2d at 619-20.

Traditionally, vertically imposed arrangements restricting competition among franchisees have been tested (and often upheld) under the rule of reason.  E.g., Am. Motor Inns v. Holiday Inns, Inc., 521 F.2d 1230, 1241-43 (3d Cir. 1975); see also 1 Glickman, Franchising § 4.03[2] (2001); XII Hovenkamp, Antitrust Law ¶ 2033 (1999).  Yet since Copperweld, several district court decisions have avoided the section 1 inquiry by deeming franchiser and franchisee part of a single entity.[8]

Once one goes beyond the classic single enterprise, including Copperweld situations, it is difficult to find an easy stopping point or even decide on the proper functional criteria for hybrid cases.  To the extent the criteria reflect judgments that a particular practice in context is defensible, assessment under section 1 is more straightforward and draws on developed law. Indeed, the best arguments for upholding MLS's restrictions--that it is a new and risky venture, constrained in some (perhaps great) measure by foreign and domestic competition for players, that unquestionably creates a new enterprise without combining existing competitors--have little to do with its structure.

In all events, we conclude that the single entity problem need not be answered definitively in this case.  The case for

---

[8]The criteria suggested in these cases are so general and so various (unity of interest, lack of existing competition, extent of control), as to emphasize the lack of any developed body of law. See Search Int'l, Inc. v. Snelling & Snelling, 168 F. Supp. 2d 621, 624-26 (N.D. Tex. 2001); St. Martin v. KFC Corp., 935 F. Supp. 898, 906 (W.D. Ky. 1996); Hall v. Burger King Corp., 912 F. Supp. 1509, 1548 (S.D. Fla. 1995); Williams v. Nevada, 794 F. Supp. 1026, 1030-32 (D. Nev. 1992), aff'd, 999 F.2d 445 (9th Cir. 1993) (per curiam).

expanding Copperweld is debatable and, more so, the case for applying the single entity label to MLS. But even if we assume that section 1 applies, it is clear to us that the venture cannot be condemned by per se rules and presents at best a debatable case under the rule of reason. More significantly, as structured by plaintiffs themselves, this case would have been lost at trial based on the jury's rejection of plaintiffs' own market definition.

The rejection of the per se rule is straightforward. Although players portray MLS as a sham for horizontal price fixing, the extent of real economic integration is obvious. Further, MLS and its investors did not compete previously; the arrangement was formed as a risky venture against a background of prior failure, cf. United States v. Jerrold Elecs. Corp., 187 F. Supp. 545, 556-68 (E.D. Pa. 1960), aff'd, 365 U.S. 567 (1961); and the outcome has been to add new opportunities for players--a Division I soccer league in the United States--and to raise salaries for soccer players here above existing levels.

The possibility that a less integrated and restrictive salary regime might make some individual salaries even higher is hardly conclusive. Without the restrictions, MLS might not exist or, if it did, might have larger initial losses and a shorter life. This would hardly enhance competition. Thus, the effects of the MLS arrangement are simply too uncertain to warrant application of the per se rule. NCAA v. Bd. of Regents, 468 U.S. at 100-103. As in any other non-per se case, players would have to show that MLS exercised significant market power in a properly defined market,

that the practices in question adversely affected competition in that market and that on balance the adverse effects on competition outweighed the competitive benefits. See Augusta News Co. v. Hudson News Co., 269 F.3d 41, 49 (1st Cir. 2001).

Here, the jury said that neither the United States nor Division I delimited the relevant market--findings that imply that MLS faced significant competition for player services both from outside the United States and from non-Division I teams. That inference at a minimum creates uncertainty as to whether the jury could have found market power under section 1. However, the peculiar assemblage of evidence, including MLS-authored materials suggesting that it expected to exercise some control over player salaries (see Part III below), makes it impossible to rule out abstractly the possibility of a jury finding of MLS market power in a broader market.

MLS has urged that the jury verdict rejecting the United States/Division I market urged by plaintiffs should be preclusive. The argument purportedly rests on the doctrine of collateral estoppel. We agree with the plaintiffs that collateral estoppel goes no further than to preclude them at a new trial from urging the market already rejected by the jury. Restatement (Second) of Judgments §§ 27-28 (1982). In theory, there may be a broader market which plaintiffs might show (without contradicting the jury findings) in which unrestricted salary competition between the MLS operator/investors might result in somewhat higher player salaries.

In that event, assuming that the single entity defense failed, a basis for liability might exist.

However, we have been given no reason to think that any other market would have been alleged and made the subject of proof if the section 1 claim had gone to trial along with the section 2 claims. In their complaint, the plaintiffs' main theory under count I was that MLS operated as a price-fixing or group boycott conspiracy for which no market power needed to be shown. A relevant market was nevertheless alleged in count I, apparently because the plaintiffs recognized that a pro-competitive purpose might be urged and a rule of reason balancing might be required. That relevant market was described by count I, as in the section 2 and section 7 counts, as competition for Division I soccer players in the United States. See Plaintiffs' First Amended Complaint ¶¶ 32, 59, 70, 78.

Proof of such a market was the consistent theme of plaintiffs' section 2 trial evidence. To be sure, had the section 1 claim been put to trial, the plaintiffs could have sought to amend their complaint to allege a different market, but there is no obvious reason to think that they would have done so. The United States/Division I theory alleged in the complaint was the most favorable for each of their claims and the easiest to define; and the focus on a single market theory would have allowed the plaintiffs to focus their proof on a single market definition. Plaintiffs did have some incentive to allege a broader market under

sections 1 and 7,[9] but that incentive existed when they filed their complaint as well.

Even if the players had sought to amend their complaint after summary judgment, we have great doubt whether such an amendment would have been permitted. See Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 51-52 (1st Cir. 1998). The district court granted summary judgment in April 2000--more than three years after the initial complaint was filed, more than one year after discovery was largely complete, and barely five months before beginning of trial. At that point in the proceedings, adding a new market theory would have substantially altered the contours of the case--potentially requiring new discovery and expert analyses based on the new alleged market.[10]

We thus have every reason to think that if the section 1 claim had not been dismissed on summary judgment it would have been presented at trial with the same market analysis alleged in the complaint. It follows that had the district court allowed the section 1 claim, it too would have been defeated by the jury's finding that the market alleged in the complaint had not been

---

[9]Whereas section 2 requires monopoly power or a prospect of it, significant market power is enough to trigger section 1's rule of reason approach; similarly, something less than monopoly power is required to condemn mergers under section 7's "substantially lessen competition" test. Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Co., 579 F.2d 20, 27 n.11 (3d Cir. 1978).

[10]Indeed, by June 1999, players' economic expert, Roger Noll, had concluded that the relevant market was limited to U.S. Division I soccer; he did not attempt to define any alternative market, nor did he suggest that MLS might exercise market power in some broader market.

-21-

proved. Accordingly, any error in dismissing the claim based on a single entity theory was harmless so long as the jury verdict stands, a matter we address in the next section. The outcome, as the plaintiffs shaped their own case, would have been the same. Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 62 (1st Cir. 2001).

## III. SHERMAN ACT SECTION 2

At trial, players alleged three possible violations of section 2: that MLS monopolized the market for Division I professional soccer in the U.S.; that it attempted to monopolize that market; and that it conspired with the USSF to monopolize the same market. The jury found that players had failed to establish the relevant market as alleged; it reached no other issue in the case. The court thereafter entered judgment for the defendants on all three section 2 claims.

Monopolization and attempted monopolization claims. At the outset, players contend that the district court erred by refusing to allow them, in their monopolization and attempted monopolization claims, to argue that elimination of competition for players was an anticompetitive means of monopolization. The district court did so on the ground that this argument would simply resurrect the section 1 claim that had already been rejected by its single entity ruling; section 2 remained available to attack the exclusivity arrangement between MLS and the USSF, which was the gravamen of the complaint's section 2 count. Players respond that

-22-

the same conduct may constitute an element of both antitrust claims.

To show monopolization, players had to prove that MLS had engaged in an act that helped create or maintain its alleged monopoly. III Areeda & Hovenkamp, Antitrust Law ¶ 650a (rev. ed. 1996). In section 2 cases, the wrongful act is usually one designed to exclude competitors from the market (e.g., predatory price, exclusive dealing). See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 & n.32 (1985). If MLS and its operator/investors are viewed as a single competitor, then the league's centralized hiring structure hardly constitutes an exclusionary act, even if it results in below-market wages for players. See Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 927 (1st Cir. 1984). After all, suppressing player salaries ought to spur, rather than impair, competition from rival leagues.

However, if the operator/investors are viewed instead more as individual potential competitors--an issue that we (unlike the district court) have not decided--it is not difficult to see how an agreement among them not to compete--a mirror image of players' section 1 claim--might create a monopsony and eliminate competition among them. See III Areeda & Hovenkamp, supra, at ¶ 703a. Such an act would arguably "exclude" competition for purposes of section 2, even if it did not harm individual competitors. Anyway, "exclusion" is only a gloss on the statutory term "monopolize"; and "merger to monopoly," benign as to the merged competitors, is a feasible section 2 claim, see Golden Grain

-23-

Macaroni Co. v. FTC, 472 F.2d 882, 886 (9th Cir. 1972), even if it is more often challenged under Clayton Act section 7, which requires much less.

Nonetheless, the jury's findings remain as an obstacle. Attempt and monopolization both require a showing that a market has been or may well be subject to monopoly power, Spectrum Sports, Inc. v. McQuillan, Inc., 506 U.S. 447, 457-58 (1993); the only market alleged by the players was rejected by the jury; and this dooms the players' section 2 claims regardless of which practice-- the exclusive arrangement with the USSF or the agreement not to compete for players--is alleged to satisfy the exclusionary act element of the cause of action. This assumes, however, that the jury verdict stands.

Not surprisingly, players next shift their focus to the jury verdict. They say the jury's market findings were tainted by several trial errors. We review the jury instructions de novo, Ponce v. Ashford Presbyterian Cmty. Hosp., 238 F.3d 20, 24 (1st Cir. 2001), and the court's evidentiary rulings for abuse of discretion unless (as is occasionally true) an issue of abstract law is presented, United States v. Sposito, 106 F.3d 1042, 1046 (1st Cir. 1997).

First, players say the court's instructions to the jury on how to define the relevant market were inaccurate and misleading. Players claim the instructions left the jury unable to weigh the significance of evidence showing that some MLS players had employment opportunities in other leagues. For example, MLS

-24-

offered testimony that its players had played in 67 different foreign leagues, prior to or after playing for MLS; plaintiffs countered that the opportunities were more limited and less attractive than MLS claimed.

Specifically, plaintiffs complain that the district court refused to give two requested instructions: first, that the jury in defining the relevant market "should consider whether any effective competition significantly restrains MLS's ability to control wages for its players"; and second, that the jury should include in the relevant market only those leagues which are "sufficiently attractive and practically available to a large enough number of MLS players to prevent MLS from having the power to pay wages below competitive market levels."

The first problem is that the plaintiffs did not preserve these two requests by making, as Fed. R. Civ. P. 51 requires, a post-instruction objection "stating distinctly the matter objected to and the grounds of the objection." Plaintiffs did not repeat these two requests in the same words; instead they objected after the charge that the instructions had overemphasized the concept of substitutability at the expense of "other factors" that have been identified in the case law, which plaintiffs' brief in this court says includes "the ability of other leagues to constrain the power of MLS to depress plaintiffs' wages."

Unfortunately, plaintiffs' counsel did not spell out the last quoted objection at the post-charge conference. To refer only to "other factors" obviously does not tell the judge just what

previously requested instruction has been omitted or identify the factors claimed to be insufficiently stressed. Davis v. Rennie, 264 F.3d 86, 100 (1st Cir. 2001). Accordingly, the failure to give the two instructions in question is reviewed only for "plain error"; especially in a civil case this is a very hard test to meet because over and above plain error, it requires a showing both of prejudice and a miscarriage of justice or something of this magnitude. See id. at 101.

As it happens, the district court gave standard instructions on market definition which, to a considerable extent, tracked the ABA's model jury instructions in civil antitrust cases. ABA Sample Jury Instructions in Civil Antitrust Cases, at C-6 to C-13 (1999). It defined monopoly power as "the power to pay lower than competitive wages for the services being acquired without having the sellers of those services--the players--turn to another league or team for employment"; and it explained that the geographic market was the geographic area "to which players can turn, as a practical matter, for alternate opportunities for employment as professional soccer players." Accord United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 357-61 (1963); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).

The district court could permissibly have enlarged on the issue, explaining (for example) that a foreign league would be more likely part of the market as the number of players who could turn to it increased. But how much to elaborate is largely the discretion of the district court, Interstate Litho Corp. v. Brown,

-26-

255 F.3d 19, 29 (1st Cir.), cert. denied, 122 S. Ct. 666 (2001), and in some respects, the players' more detailed formulation could itself be misleading:  MLS could be constrained so long as enough individual players had <u>an</u> alternative foreign league even if an <u>individual</u> foreign league would <u>by itself</u> attract or be available to only a small number of players.[11]

Next, players claim the court erred in permitting Alan Rothenberg, one of the founders of MLS and former president of the USSF, to testify about a legal opinion received by the USSF while shielding the opinion from discovery or questioning.  On direct and then on cross-examination, Rothenberg disclosed without detail that the USSF board had obtained a legal opinion that it was lawful to grant exclusive Division I certification to a single league.  At trial, the players sought to discover the opinion or have all references to it struck.  The court denied both requests, finding that Rothenberg had not waived the attorney-client privilege by making his brief references.

It is true, as MLS asserts, that the statement was first adduced on direct examination by plaintiffs, and its repetition on cross added nothing new.  On the other hand, plaintiffs did not ask the witness whether a legal opinion had been sought or about its contents.  The witness, himself a lawyer, more or less volunteered this information.  Possibly, the district judge felt that the

---

[11]It is well-settled that a party claiming that an instruction should have been given forfeits the objection if the instruction it tenders is itself objectionable. <u>See</u> <u>Savard</u> v. <u>Marine Contracting, Inc.</u>, 471 F.2d 536, 540 (2d Cir. 1972).

disclosure, even if not directly invited, was legitimate because otherwise the witness--who had been asked whether antitrust concerns had been raised by the USSF board--would have been forced to leave the impression that they had been raised but not seriously addressed or resolved.

We think that if defense counsel had adduced this disclosure in the first instance it would be unfair to allow the legal opinion to be used affirmatively without allowing plaintiffs to examine it or, at the very least, requiring a severe limiting instruction (which plaintiffs did not request). The case law is mixed as to whether there is a waiver of the privilege where there is a very limited disclosure as to the ultimate opinion without a disclosure of contents and the answer may depend upon context.[12] But on our facts, it is fairly arguable that the plaintiffs opened the door to the response and, if so, could not use their own conduct to force the waiver.

So viewed, the district court's decision is tested under an abuse of discretion standard, and we are unwilling to say that the decision here was an abuse. Whatever discomfort we feel--and there is some--is assuaged by our grave doubt that Rothenberg's disclosure of the opinion as to lawfulness could have had any effect on a jury verdict that plaintiffs had failed to prove the relevant market they alleged. Plaintiffs make a stab at showing

---

[12]See United States v. Desir, 273 F.3d 39, 45-46 (1st Cir. 2001); Frontier Ref., Inc. v. Gorman-Rupp, 136 F.3d 695, 704 (10th Cir. 1998); Rhone-Poulenc Rorer, Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994).

-28-

prejudice by equating the failure to prove the relevant market with lawfulness; but although this might be plausible in the abstract, the notion that the jury decided an essentially factual issue, as to which there was a mass of conflicting evidence, on the basis of a brief reference to a legal opinion seems to us highly remote.

Next, players say the court erred in excluding two pieces of documentary evidence that supported their claims of market definition and market power. The first is a September 1994 correspondence between Clark Hunt, a prospective MLS operator/investor, and Mark Abbott, an executive working on the formation of MLS, regarding assumptions made in a financial model disseminated by the league's organizers. Hunt later became an operator/investor in the league through a firm he helped form, which was a defendant below; Abbott became a senior league officer.

In his letter, Hunt urged that the team player salary budget be reduced by $70,000, with the "bulk of the reduction" coming from the "bottom 12 players on each team whose only alternative is to play in one of the other U.S. professional leagues or one of the lower division foreign leagues." Hunt also suggested that salary growth should also be limited to five percent a year, reasoning that "[u]ntil there is significant domestic-based competition for MLS players, the rate of salary growth should be relatively easy to contain." In response, Abbott cautioned that "a reduction of $70,000 in player salaries per team [would] impact the quality of players we are able to attract." At the same time, he

agreed that, "for modeling purposes the player salaries should be held to [a] 5% [increase] per year."

The court excluded the correspondence, finding it irrelevant since it was not "made by someone who matters to the case" and the transcript then reveals a four-page colloquy in which the parties argue about the issue with the judge. Plaintiffs' main basis for urging admission of the Hunt letter was that it tended to show Hunt's own intent to monopolize, the suggestion being that this view should also be attributed to the firm that Hunt formed (apparently later) which became an operator/investor and defendant in the case. On this appeal, plaintiffs switch grounds and urge that the Hunt letter and Abbott's reply as well were evidence of plaintiffs' proposed market definition.

Whether the evidence should have been admitted to show intent on the attempt to monopolize claim is a nice issue but irrelevant here since the jury resolved the case on market definition grounds. Plaintiffs' present claim that the evidence should have been admitted to bolster their market theory and show the existence of monopoly power founders because it was never offered for that purpose. See United States v. Joselyn, 206 F.3d 144, 154 (1st Cir. 2000). Further, although no hearsay objection was made, an interesting question remains whether Hunt's statement as a prospective investor is properly admissible for either purpose as an admission of the defendant firm that Hunt later helped form. Fed. R. Evid. 801(d)(2).

As to Abbott's letter, it appears from the transcript that the court was prepared to consider admitting the letter without the Hunt document but plaintiffs' counsel understandably demurred. Abbott's statements are quite tame (the first suggests a lack of market power as to quality players and the second was "for modeling purposes"). Plaintiffs' further suggestion--that Abbott was adopting on behalf of MLS whatever was said in the Hunt letter--is a stretch that the language of the letter does not support.

Further, any error was harmless. Players were allowed to introduce numerous other documents, authored by MLS itself, expressing virtually the same opinions. For example, players were allowed to introduce a November 1995 offering memorandum, in which MLS admits that it "does not view [the Division I and Division II or indoor soccer leagues] as significant competition."[13] And at trial, players' economic expert, Roger Noll, relied on these documents to support his testimony and conclusions. The excluded correspondence was thus redundant and could hardly have changed the outcome.

The next piece of evidence is a March 1994 internal memorandum written by two employees of the investment firm

---

[13]Players also introduced the league's 1993 business plan, in which MLS asserted that it would be able to maintain its salary structure because "[i]t is not anticipated that there will be any other significant domestic professional league to compete for players' services." Another document allowed in evidence, a December 1994 offering memorandum, said "MLS believes it will be able to maintain this salary structure because of the competitiveness of the salary and benefit package and the lack of comparable alternatives in the United States to players."

Donaldson, Lufkin & Jenrette ("DLJ"). MLS's promoters had approached DLJ to act as its financial advisor. In the memo, the DLJ employees conclude that MLS has favorable prospects for success, noting, inter alia, that the league will "be able to operate with a strict salary cap," and that there "is a plentiful supply of good American players that have limited professional opportunities to play elsewhere."

The court excluded the memo, first, on hearsay grounds, since it was unclear whether an agency relationship existed at the time the memo was drafted and whether its contents were within the scope of the agency, Fed. R. Evid. 801(d)(2)(D); and second, on relevance grounds, since the views were not attributable to MLS. On appeal, plaintiffs simply do not respond to the claim that at the time the statement was made, DLJ was an independent contractor and not an agent of MLS. See Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1440 (9th Cir. 1990).

In all events, the other documents discussed above which were introduced into evidence contained virtually identical statements penned by MLS itself attesting to MLS's early view that competition in the market was limited. And the DLJ memo, while helpful to players' cause, was hardly dispositive; it addressed only the opportunities of American soccer players and said nothing about the 40% of MLS players who have foreign or dual citizenship and yet are part of plaintiffs' class. By contrast, MLS's own statements which were introduced were more helpful to plaintiffs.

Next, players claim the court erred in permitting a

-32-

defense witness, Neil Farnsworth, co-owner of a Seattle Division II professional soccer team, to testify that he was competing with MLS for two specific players, while refusing to identify the players by name on "confidentiality" grounds.

At trial, Farnsworth testified that:

> We compete with MLS for players every day. We have a situation right now where I have one player that is being courted by MLS. He's rejected one offer by MLS now to stay with us.
>
> . . .
>
> We also have a player from MLS that has played in MLS for probably four years that has contacted us for next season expressing an interest to play for us and then play indoor in addition to playing for us, instead of playing for MLS.

On cross-examination by players' counsel, Farnsworth revealed certain details about the player from his own team, including his salary, but he refused to identify either that player or his MLS recruit by name, claiming he wanted to keep the information confidential. Players' objections were denied; the district court ruled that the players' privacy was at stake, and therefore, that their names were properly excludable under Fed. R. Evid. 403. The court also refused players' request to instruct the jury to ignore the testimony.

Players claim the district court infringed their right to cross-examine Farnsworth and to test the truth of his assertions. To be sure, the court has the authority to "protect witnesses against cross-examination that does little to impair their credibility but that may damage their reputation, invade their

-33-

privacy, and assault their personality.  Rule 403 would permit the protection of even total strangers to the action." 22 Wright & Graham, Federal Practice and Procedure § 5215 (1978) (citation omitted); see Fed. R. Evid. 611(a).  But this power is limited to situations in which the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. Fed. R. Evid. 403.

Although much discretion resides in the trial judge in striking this balance, Gasperini v. Ctr. for Humanities, Inc., 149 F.3d 137, 143 (2d Cir. 1998), the denial of the names certainly limited plaintiffs' ability to cross-examine Farnsworth and it is unclear to us just what substantial privacy interest was at stake: if anything, the players would want to shield their names from MLS, but the league knew whom it was courting from Farnsworth's team and the possible defector presumably would in due course use Farnsworth's overtures in bargaining with MLS.

Nonetheless, even without the names, players were able to test Farnsworth's testimony,[14] and other witnesses--including current and former players and soccer officials--testified to player movement between leagues.  For example, Ivan Gazidas, MLS's vice president of operations and player relations, testified at length concerning the competition MLS faced to attract the talents of several named players from other leagues.  Farnsworth's

---

[14]For example, on cross-examination Farnsworth admitted that he could not be certain whether his player had actually ever received an offer from MLS.  Similarly, he  admitted he could not be sure whether the MLS player he was recruiting actually had an offer to play in MLS the following season.

-34-

anecdotal testimony, while somewhat helpful to MLS, was by no means the most powerful evidence adduced at trial to demonstrate inter-league competition. Accordingly, we find the error was harmless.

Finally, players claim the court erred in admitting in evidence a chart summarizing the testimony of two defense witnesses and later permitting the jury to take the chart with them into the jury room for deliberations. The summary chart listed 67 professional soccer leagues of different divisions from 46 countries; at trial, the two witnesses testified that MLS players had experience in each of the leagues and marked the chart accordingly. Both sides used demonstratives at trial which were admitted into evidence; while players complain generally about the use of the demonstratives, this summary chart is the only item they single out on appeal.

In admitting the summaries, the district court reasoned that the demonstratives would "help the jury to think about a complex case." At the same time, it recognized the risks involved, see Air Safety v. Roman Catholic Archbishop, 94 F.3d 1, 7 n.14 (1st Cir. 1996), and emphasized in its instructions to the jury that summaries do not "present any independent evidence." It further cautioned them that the summaries are "admitted for your convenience and not to substitute for the full testimony of the witnesses."

It is hard to imagine an issue on which a trial judge enjoys more discretion than as to whether summary exhibits will be helpful. Nothing precludes their use with respect to oral

testimony.[15]  Here the issues involved in the case and the testimony were complicated and the jury was properly cautioned as to the limited role of summaries.  Although the court admitted the charts as "evidence," its instruction made clear that they were merely aids and that the testimony controlled.  We find no abuse of discretion and need not concern ourselves with whether, as MLS claims, the objection was somehow waived.

Conspiracy to monopolize.  In their third and final section 2 claim, players allege that MLS conspired with the USSF "to prevent any other entity from being sanctioned as a Division I professional soccer league in the United States or otherwise competing against MLS."  The court decided that players were required to prove the existence of their relevant market on the conspiracy to monopolize claim; it directed the jury to end its inquiry on all section 2 claims if it found players had failed to prove the existence of their market.

At trial and now on appeal, players say claims of combination or conspiracy to monopolize do not require proof of a relevant market.  For these purposes plaintiffs are not distinguishing between the concept of a relevant market and the concepts of monopoly or market power:  they are arguing that the prospect that the alleged conspiracy if successful would achieve monopsony power in a real economic market was irrelevant to their claim.  Instead, they say they were required to prove only the

---

[15]United States v. Scales, 594 F.2d 558, 563 (6th Cir.), cert. denied, 441 U.S. 946 (1979); Fed. R. Evid. 611(a); see also 6 Weinstein's Federal Evidence § 1006.08[4] (2001).

existence of the conspiracy; an overt act in furtherance of it; and specific intent to monopolize. E.g., Salco Co. v. Gen. Motors Co., 517 F.2d 567, 576 (10th Cir. 1975).

Conspiracy to monopolize claims are not often the subject of much attention, since almost any such claim could be proved more easily under section 1's ban on conspiracies in restraint of trade. IIIA Areeda & Hovenkamp, Antitrust Law ¶ 809 (1996). However, a majority of courts that have touched the issue have said, in general terms and often without analysis, that proof of a relevant market, and hence, market power, is not required in a conspiracy to monopolize claim. E.g., Salco, 517 F.2d at 576; see IIIA Areeda & Hovenkamp, supra, at ¶ 809 & n.2 (collecting cases); ABA Sample Jury Instructions in Civil Antitrust Cases, supra, at C-100 n.3.

On the other side, there are also a number of decisions that say that a relevant market is necessary.[16] That is also the view of the more persuasive commentary, including the most respected of the antitrust treatises. IIIA Areeda & Hovenkamp, supra, at ¶ 809; accord Comment, The Relevant Market Concept in Conspiracy to Monopolize Cases under Section 2 of the Sherman Act, 44 U. Chi. L. Rev. 805 (1977). Although we lean toward this view as a general matter, a black or white rule is not inevitable: there may in principle be some cases in which one could argue that

---

[16]E.g., Doctor's Hosp. of Jefferson, Inc. v. S.E. Med. Alliance, Inc., 123 F.3d 301, 311 (5th Cir. 1997); Bill Beasley Farms, Inc. v. Hubbard Farms, 695 F.2d 1341, 1343 (11th Cir. 1983); Alexander v. Nat'l Farmers Org., 687 F.2d 1173, 1182 (8th Cir. 1982); Joe Westbrook, Inc. v. Chrysler Corp., 419 F. Supp. 824, 845 (N.D. Ga. 1976).

a conspiracy claim should be provable without a showing that the alleged market is a real economic market. This case is not among them.

Here the "conspiratorial agreement" is a garden variety exclusive dealing arrangement limited to three years. Such agreements are not inherently unlawful; they are judged primarily by considering, in addition to competitive or efficiency justifications, any actual or threatened adverse effects on competition. Tampa Elec. Co., 365 U.S. at 327; U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 594 (1st Cir. 1993). Predicted effects turn, obviously, on the establishment of a market in which the exclusive dealing arrangement may affect prices or competitors. Absent threatened effects, there is normally no basis for condemning an exclusive dealing arrangement.

All implemented exclusive dealing contracts involve both a nominal conspiracy (the agreement) and acts in furtherance (whatever dealings take place). To tell a jury that it may condemn such contracts--without proof of any threatened effect on the market--would create not only confusion for the jury but invite an end run around the threatened effects required by the case law for exclusive dealing under both section 1 and the attempt and monopolization requirements of section 2. IIIA Areeda & Hovenkamp, supra, at ¶ 809.

The point is summed up neatly in the Areeda-Hovenkamp treatise:

> Where the agreements involved would also be
> held to offend §1 without the necessity of

> proving power, the failure to require it for the §2 conspiracy offense is understandable. <u>However, in those instances where [market] power is a prerequisite to holding an agreement to be an unreasonable restraint of trade--a joint venture, for example--it would make no sense to hold the same agreement offensive to §2 without proof of power</u>. To require power under §1 before condemning a particular agreement is necessarily to say that the arrangement is socially desirable, or at least not harmful, in the absence of power. That policy conclusion cannot sensibly be avoided or negated by the simple trick of calling the agreement a conspiracy to monopolize.

IIIA Areeda & Hovenkamp, <u>supra</u>, at ¶ 809 (emphasis added).

Where parties agree to achieve an admittedly unlawful result, such as a murder or burglary, there is case law to the effect that the prosecutor need not show that the plan was feasible and that impossibility (at least in some situations) is not a defense. 2 LaFave & Scott, <u>Substantive Criminal Law</u> § 6.5(b) (1986); <u>Developments in the Law--Criminal Conspiracy</u>, 72 Harv. L. Rev. 922, 944-45 (1959). This is presumably the source of the antitrust case law relied on by plaintiffs. But the rationale of this classic view is that the conspiracy should be punished because the demonstrated intent to break the law shows that the conspirators are dangerous even if this particular venture was impractical. 2 LaFave & Scott, <u>supra</u>, at § 6.5(b).

Perhaps this view is equally justified in antitrust cases where the evidence shows that the conspirators were aiming at a demonstrably illegal result, say, a world wide monopoly of gold production or a naked horizontal allocation of markets. In our case, there is no dispute that defendants aimed at being the only

-39-

Division I soccer league in the United States at least for three years and that they enlisted the USSF to achieve this end. But the illegality of such an arrangement is far from clear. To ignore the question whether this is a relevant market in the economic sense is to assume that the end aimed at is illegal. Here, the jury found that control of U.S./Division I soccer would not comprise a monopoly.

In sum, there may be contexts in which the existence vel non of a relevant market is beside the point in a conspiracy to monopolize case, but this case is not one of them. The exclusivity agreement sought by MLS might be unlawful if it threatened adverse competitive effects but not otherwise; and this in turn required proof that someone who was the only purchaser of Division I soccer player services in the United States would control prices in an economic market.

## IV. CLAYTON ACT SECTION 7

In their final argument, players say that the district court erred in dismissing their claim that the formation of MLS violated section 7 of the Clayton Act. Count IV of the complaint alleged that, "[i]f not for this combination of assets and purchase of stock, MLS Member Teams would compete with each other for players, like teams in all other major professional sports leagues in the United States." Section 7 prohibits, with certain commerce-related conditions, stock or asset acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

-40-

The district court granted summary judgment to the defendants on the ground that "[t]here can be no § 7 liability because the formation of MLS did not involve the acquisition or merger of existing business enterprises, but rather the formation of an entirely new entity which itself represented the creation of an entirely new market." Fraser, 97 F. Supp. 2d at 140. According to the district court:

> The relevant test under § 7 looks to whether competition in existing markets has been reduced. . . . Where there is no existing market, there can be no reduction in the level of competition. There are no negative numbers in this math; there is nothing lower than zero. Competition that does not exist cannot be decreased. The creation of MLS did not reduce competition in an existing market because when the company was formed there was no active market for Division I professional soccer in the United States.

Id. at 140-41 (citing SCM Corp. v. Xerox Corp., 645 F.2d 1195 (2d Cir. 1981)).

Both sides make much of the district court's reference to a "new market." Players say that this contradicts the jury's finding that United States/Division I soccer is not a separate market and, anyway, there is no implied immunity from section 7 for combinations that lessen competition in a new market. Defendants say that the district court merely held the players to the market they themselves alleged and was entitled to do so on summary judgment.

The district court was saying no more than that, after the failure of the NASL and prior to the formation of MLS, there was no enterprise engaged in providing Division I soccer in the

-41-

United States and thus that a combination that added Division I soccer in this country could hardly reduce competition where none before existed. This is plainly correct insofar as the creation of MLS added a new entrant without subtracting any existing competitors. To this extent, the most common threat addressed by section 7--the merger of two or more entities currently competing with one another, e.g., United States v. Philadelphia Nat'l Bank, 374 U.S. 321 (1963); Brown Shoe Co. v. United States, 370 U.S. 294 (1962)--is not present in this case.

The Supreme Court has recognized that section 7 also reaches mergers that combine an existing competitor with a potential competitor commonly perceived to be a strong potential entrant where the number of such entrants is limited. United States v. Marine Bancorp., Inc., 418 U.S. 602, 624-25 (1974); United States v. Falstaff Brewing Corp., 410 U.S. 526, 531-32 (1973). In such cases, the notion is that the gobbling up of the "perceived potential entrant" removes an existing constraint on competition and thus reduces present competitive pressure that may currently be constraining price. Falstaff, 410 U.S. at 532.

The players make no attempt to show that this form of existing competitive constraint was eliminated by the formation of MLS. Rather, their explicit theory is that, if MLS were held unlawful under section 7, its operator/investors would enter the market independently, thus increasing the amount of competition over and above the level provided by MLS itself.

-42-

At the outset, the question arises whether section 7 can be used to prevent a merger that itself increases competition where it can be confidently predicted that prevention will or probably will increase competition _even more_. The classic hypothetical is the merger of an existing competitor with a non-competing company whose interest in entry is unknown and so exerts no current pressure on the market as a perceived potential entrant. Yet when its private files are examined incident to a court suit, plans are discovered for independent entry if the merger is disallowed.

The Supreme Court has expressly reserved the question whether section 7 can be read to reach such a case. <u>Marine Bancorp.</u>, 418 U.S. at 639; <u>Falstaff</u>, 410 U.S. at 537. To our knowledge only one circuit has expressly applied section 7 so broadly, <u>Yamaha Motor Co.</u> v. <u>FTC</u>, 657 F.2d 971, 978-80 (8th Cir. 1981), <u>cert. denied sub nom. Brunswick Corp.</u> v. <u>FTC</u>, 456 U.S. 915 (1982), and the district court apparently rejected this view, <u>Fraser</u>, 97 F. Supp. 2d at 141.

It is uncertain how the Supreme Court will ultimately resolve the issue. Plaintiffs' view bumps up against the most straightforward reading of the phrase "may . . . lessen competition" in which "competition" is understood to refer to the existing level of competition prior to the merger in question. Further, it is often hard enough to determine whether a merger will reduce competition in relation to a known baseline, namely, existing market conditions. If a new combination will, as here, initially enhance competition, one might hesitate at a further and

-43-

even more difficult conjecture that prohibiting the transaction would lead to even more competition further down the line.

On the other hand, the antitrust statutes are not always read literally, as Copperweld itself demonstrates, see also Standard Oil Co. v. United States, 221 U.S. 1 (1911) (rule of reason read into restraint of trade). The Antitrust Division, often a significant influence on the development of antitrust case law, seemingly supports a generous reading of Section 7 to embrace so called "actual potential competition." Dep't of Justice Non-Horizontal Merger Guidelines § 4.112, 49 Fed. Reg. 26,824, 26,834 (1984); accord V Areeda & Turner, Antitrust Law ¶ 1118 (1980). And there might be cases where the facts might compel the conclusion that turning down a pro-competitive merger (compared to the status quo) would produce an even more competitive realignment.

That is not this case. Here, there is no possible way to predict just what would happen if the current version of MLS were precluded. Players assert that, had the operator/investors not formed MLS, they would have entered the market as a traditionally structured league. But as the district court noted, it is "not inevitable that the league would be formed and would operate the same way as previous sports leagues." Fraser, 97 F. Supp. 2d at 142. More importantly, it is quite possible these investors would have found the alternative structures unattractive and simply abandoned their effort altogether--hardly a pro-competitive outcome.

Even the alternative result suggested by players--that another, more traditionally structured league like the APSL would

-44-

have received the Division I sanction instead--appears on the surface no more pro-competitive. The evidence indicates that the APSL was not as well financed or well managed as MLS (hence the USSF's decision to certify MLS and not the APSL), thus increasing the risk that the new Division I league would fail in the long run. In addition, elevating the APSL to Division I status would not necessarily increase competition significantly, since the APSL, an existing minor league, may have already been in the relevant market.

It might be argued that these objections present issues that a jury ought to consider; but there is one final objection that the jury did effectively consider. Even advocates of a broader reading of section 7 concede that striking down a combination that does not threaten present competition could be justified, in the hope of obtaining more competition in the future, only in already concentrated markets. "In the absence of significant market power in the hands of existing firms, . . . the loss through merger of a potential entrant would not affect present or future competition." V Areeda & Turner, supra, ¶ 1119a.

Thus, even on the broader reading of section 7 and allowing room for conjectures about future effects, it would have been necessary for players to prove that MLS operates within a relevant economic market that is presently concentrated. In their section 7 count, the players alleged the same relevant United States/Division I market as in their section 1 and section 2 counts. For reasons already discussed in connection with the section 1 claim, the jury's rejection of this relevant market would also have

doomed the section 7 claim based on enhancing future competition if it too had been presented.

 Affirmed.