**People of the State of CALIFORNIA, ex rel Bill Lockyer, Attorney General, et al, Plaintiffs,**

**v.**

**MIRANT CORPORATION, et al, Defendants.**

**People of the State Of California, ex rel Bill Lockyer, Attorney General, et al, Plaintiffs,**

**v.**

**Reliant Energy, Inc., et al, Defendants.**

**People of the State Of California, ex rel Bill Lockyer, Attorney General, Plaintiff,**

**v.**

**Reliant Energy, Inc., et al, Defendants.**

**People of the State of California, ex rel Bill Lockyer, Attorney General, Plaintiff,**

**v.**

**Dynegy, Inc, et al, Defendants.**

**People Of The State Of California, ex rel Bill Lockyer, Attorney General, Plaintiffs,**

**v.**

**Mirant Corporation, et al, Defendants.**

**People of the State Of California, ex rel Bill Lockyer, Attorney General, Plaintiffs,**

**v.**

**Coral Power, LLC, Defendant.**

**People Of The State Of California,**

ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

Puget Sound Energy, Inc, Defendant.

People of the State Of California,
ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

Transalta Energy Marketing
(California), Inc, et al,
Defendants.

People of the State Of California,
ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

Tucson Electric Power Company,
Defendant.

People of the State of California,
ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

Idaho Power Company, Defendant.

People of the State of California,
ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

Merrill Lynch Capital Services,
Inc, et al, Defendants.

People of the State Of California,
ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

BP Energy Company, Defendant.

People of the State of California,
ex rel Bill Lockyer, Attorney
General, Plaintiffs,

v.

Portland General Electric
Company, Defendant.

Nos. C–02–1787–VRW, C–02–1788–VRW,
C–02–1791–VRW, C–02–1854–VRW, C–

02–1914–VRW, C–02–2061–VRW, C–02–
207–VRW, C–02–2400–VRW, C–02–
3036–VRW, C–02–3040–VRW, C–02–
3041–VRW, C–02–3042–VRW, C–02–
3127–VRW, C–02–3311–VRW, C–02–
3318–VRW.

United States District Court,
N.D. California.

March 25, 2003.

Harvey I. Saferstein, Nada I. Shamonki, Mintz Levin Cohn Ferris Glovsky & Popeo, Santa Monica, CA, Pamela Merchant, San Francisco, CA, for Plaintiffs.

John A. Sturgeon, Robert P. Pongetti, White & Case LLP, Los Angeles, CA, Robert B. Pringle, Thelen Reid & Priest LLP, San Francisco, CA, for Defendant.

Harvey Y. Morris, Public Utilities Commission of CA, San Francisco, CA, for Loretta Lynch.

### ORDER.

WALKER, District Judge.

Motions to dismiss and to remand in the above-captioned cases are currently pending before the undersigned. In these related cases, the Attorney General of California (AG) alleges violation of California's unfair business practices law, Cal B & P Code § 17200, by a number of wholesale electricity suppliers. Two of the actions also allege federal antitrust claims under § 7 of the Clayton Act, 15 USC § 18. Plaintiffs Department of Water Resources and the State of California join these two federal antitrust actions. For ease of exposition, the court refers to all plaintiffs as "the AG."

The remaining fifteen actions assert only state law claims under § 17200. Defendants in these cases removed the actions to federal court. On August 6, 2002, the court denied the AG's motions to remand in five of these actions (Case Nos 02–1791, 02–1854, 02–1914–VRW, 02–2061–VRW, 02–2207–VRW). Eight additional cases alleging identical causes of action under § 17200 were removed to this court and related to the other pending cases but not in time for motions to remand to be noticed and heard on July 31, 2002, with the aforementioned cases (Case Nos 02–2400–VRW, 02–3036–VRW, 02–3040–VRW, 02–3041–VRW, 02–3042–VRW, 02–3127–VRW, 02–3311–VRW, 02–3318–VRW). Defendants in all these actions, except for BP Energy (Case No 02–3311–VRW), move to dismiss or, alternatively, to stay these proceedings pending further action by the Federal Energy Regulatory Commission (FERC).

I

Because the factual background of these cases is discussed in the court's August 6, 2002, order, the court will not repeat those facts here, except to note that the related cases were classified into three categories:

(1) Antitrust cases (2 cases). *People v. Mirant*, 02–1787–VRW, and *People v. Reliant*, 02–1788–VRW, allege violation of § 7 of the Clayton Act, 15 USC § 18, and a corollary state law claim under California's unfair business practices statute, Cal B & P § 17200.

(2) Failed to File/Overcharge cases (10 cases). *People v. Reliant*, 02–2061–VRW, *People v. Mirant*, 02–2207–VRW, *People v. Coral*, 02–2400–VRW, *People v. Puget Sound*, 02–3036–VRW, *People v. Transalta*, 02–3040–VRW, *People v. Tucson Electric*, 02–3041–VRW, *People v. Idaho Pow-*

er, 02–3042–VRW, *People v. Merrill Lynch Capital*, 02–3127–VRW, *People v. BP Energy*, 02–3311–VRW, and *People v. Portland General*, 02–3318–VRW, allege two separate violations of California's unfair business practices law, Cal B & P § 17200. First, the AG alleges that these companies failed to file rate schedules as required by the Federal Power Act (FPA), 16 USC § 824 et seq. Second, the AG alleges that the companies charged unjust and unreasonable rates, as determined by FERC, which has plenary regulatory authority over wholesale electricity sales.

(3) Ancillary services cases (3 cases). *People v. Reliant*, 02–1791–VRW, *People v. Dynegy*, 02–1854–VRW, *People v. Mirant*, 02–1914–VRW, assert one cause of action under Cal B & P § 17200, alleging that defendants engaged in various unfair business practices with respect to the ancillary services they contracted to provide the ISO, whose operations are governed by a tariff on file with and approved by FERC.

The court's August 6, 2002, order addressed the AG's motions to remand, which were filed in all the removed cases. As a matter of prudent case management, the court declined to rule on the motions to dismiss at that time to allow other nearly identical cases in the process of being removed and related to achieve procedural parity with the earlier cases. Defendants in these cases were to file motions to dismiss, if they had not done so already, so that the matter could be heard on September 26, 2002.

This order addresses the (1) motions to remand currently pending in eight of the cases that were not related in time to be heard with the other remand motions on July 31, 2002, and (2) the motions to dismiss currently pending in all of the cases.

## II

As a preliminary matter, the court considers its jurisdiction to proceed as to defendant NRG Energy, Inc (NRG) in *People v. Dynegy, Inc*, Case No 02–1854–VRW, one of the ancillary services cases. On December 13, 2002, NRG notified the court that bankruptcy proceedings were commenced against it in United States Bankruptcy Court, District of Minnesota. See Notice of Bankruptcy Filing (02–1854: Doc # 50). NRG contends that, as a result of the bankruptcy proceeding, these proceedings against it are automatically stayed, pursuant to 11 USC § 362(a)(1). *Id.*

The AG, in opposition, contends that the action with respect to NRG Energy, Inc is not automatically stayed because the case falls within the scope of 11 USC § 362(b)(4), which exempts actions or proceedings "by a governmental unit * * * to enforce such governmental unit's * * * police and regulatory power." See Pl Opp (Doc # 51). The court agrees. In *In re First Alliance Mortgage Co.*, 263 B.R. 99, 108–09 (9th Cir.BAP 2001), the Bankruptcy Appellate Panel of the Ninth Circuit held that an action seeking civil penalties, commenced by a state under its consumer protection laws, fell within the narrow scope of § 362(b)(4)'s exceptions to an automatic stay. In particular, the Bankruptcy Appellate Panel found that a suit seeking civil penalties for fraudulent business practices was not pursued "*solely* to advance a pecuniary interest of the governmental unit." Id at 107. Instead, the suit was meant to "effectuate public policy" as opposed to "adjudicate private rights" which might otherwise be at issue in bankruptcy proceedings. Id at 108. Because the suit fell within the scope of § 362(b)(4)'s exception, "which is to prevent the bankruptcy court from becoming a haven for wrongdoers," id at 109 (citing *In re Berg*, 230 F.3d 1165, 1167 (9th Cir. 2000)), the Bankruptcy Appellate Panel reversed the bankruptcy court's stay of proceedings.

Similarly, in the instant case, the AG seeks to enforce its unfair competition laws on behalf of the public by way of civil penalties. The AG does not seek restitution or other private forms of relief that might create a conflict between bankruptcy and other proceedings that would necessitate a stay. *First Alliance Mortgage Company*, 263 B.R. at 108–09. Hence, the court finds that the bankruptcy proceedings against NRG in Minnesota district court do not stay these proceedings against NRG.

## III

Motions to remand are currently pending in eight cases, all of which are failure to file/overcharge cases, as described above. These motions are substantively identical to the motions to remand considered and denied by the court in its August 6, 2002, order. The parties raise no new material arguments in these more recent motions. The court therefore relies on the reasoning and analysis contained in its August 6, 2002, order and DENIES the AG's motions to remand in these cases (02–2400: Doc # 13; 02–3036: Doc # 16; 02–3040: Doc # 26; 02–3041: Docs ## 16,34; 02–3042: Doc # 25; 02–3127: Docs ## 15,16; 02–3311: Docs ## 12,14; 02–3318: Docs ## 9,21).

## IV

■ The court now turns to the motions to dismiss. By written order dated September 3, 2002, pursuant to the procedure described by the Ninth Circuit in *Chuman v. Wright*, 960 F.2d 104 (9th Cir.1992), the court certified that the AG's pending appeal of the court's denial of remand cases was "frivolous". 9/3/02 Order (e g, 02–1791: Doc # 78). Consequently, notwithstanding the AG's pending appeals of the court's denial of remand, the court in these cases nevertheless retains jurisdiction to proceed. *Chuman*, 960 F.2d at 105.

The AG, on March 19, 2003, filed a "memorandum in opposition" to defendants' notice regarding the pendency of these submitted motions in *People v. Reliant*, Case No 02–1791–VRW. The AG asserts that because the Ninth Circuit, the day before, denied defendants' motion to dismiss for lack of jurisdiction without prejudice and referred their appeals to a merits panel, this court "has been divested of jurisdiction". See Pl Mem (02–1791: Doc # 87), at 2.

The AG is incorrect. While the Ninth Circuit undoubtedly possesses jurisdiction to consider the AG's appeal under the collateral order doctrine, this court may nevertheless proceed during the pendency of the appeal because it has already certified the appeal's frivolousness in writing, pursuant to a procedure adopted by the Ninth Circuit in *Chuman*, 960 F.2d at 105 (9th Cir.1992). See 9/3/02 Order (02–1791: Doc # 78). As explained previously, frivolous appeals can "significantly disrupt and delay trial court proceedings" and, in so doing, may "injure the legitimate interests of other litigants and the judicial system." *Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir.1989). By certifying in writing that the AG's appeal is frivolous, the court is able to retain jurisdiction pending appeal. See *Chuman*, 960 F.2d at 105. Moreover, the Ninth Circuit, by order dated December 31, 2002, denied the AG's emergency motion for a stay of this court's proceedings pending appeal. See 12/31/02 Ninth Circuit Order (02–1791: Doc # 85). There being no question of the court's jurisdiction to proceed, the court considers the merits of defendants' pending motions to dismiss.

■ In a FRCP 12(b)(6) motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff. See *In re Silicon Graphics Inc. Sec. Lit.*, 183 F.3d

970, 980 n. 10 (9th Cir.1999). Judicial notice of documents referenced in the complaint is also appropriate. See *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994).

Dismissal is appropriate if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## V

The court first considers the AG's federal claims in the antitrust cases. In these cases, the AG alleges that Reliant and Mirant acquired significant power generation holdings in violation of § 7 of the Clayton Act. The AG alleges that through these acquisitions, defendants obtained significant market power which they then used to manipulate prices during periods of higher demand.

## A

▮ As an initial matter, the AG objects to the court taking judicial notice of the content of various public documents in the federal antitrust cases. See Pl Objs (02–1787: Doc # 18); Pl Objs (02–1788: Doc # 21). The AG does not object to the court taking judicial notice of the existence of the documents, for example, the fact that the AG filed a complaint with FERC, see Def RJN (02–1787: Doc # 14, Exh 3) at Exh 7, or the fact that FERC issued various rulings pertinent to these actions, see *id*. at Exh 1. Instead, the AG objects to defendants' request that the court take judicial notice of "the information contained" in the documents. See *id*. at 1.

Judicial notice of these documents is appropriate as they are a part of the public record. In taking judicial notice of these documents, the court does not adopt their factual findings or holdings; it simply acknowledges their existence and contents. Many of the factual findings in these documents are disputed by the parties. On a motion to dismiss, the court assumes that the plaintiff's version of events is correct. See *In re Silicon Graphics*, 183 F.3d at 980 n. 10. And the court does that here.

▮ In addition, the AG objects to Mirant's inclusion of Exhibit 4, which Mirant terms the final environmental impact statement. In its request for judicial notice, Mirant does not describe how this environmental impact statement is part of the public record. Mirant appears to argue that the statement is part of the public record at FERC, but does not so state directly. In addition, the document itself is labeled "draft environmental impact report," undermining Mirant's assertion that the document is "final" and not subject to reasonable dispute. As Mirant has failed to authenticate this document properly, the court declines to take judicial notice of Exhibit 4. Having disposed of the AG's evidentiary objections, the court turns to the merits of defendants' motions to dismiss.

## B

Defendants argue that the acquisitions in question could not, as a matter of law, lessen competition, because the acquisitions were a part of the deregulation of the electricity market in California; before the acquisitions in question, there was no competition. In the alternative, defendants argue that the AG has failed properly to allege the relevant market for purposes of his antitrust claims, that the state action doctrine provides immunity and that the AG's claims are preempted by the filed

rate doctrine. The court considers these arguments in turn.

### 1

■ Section 7 of the Clayton Act makes unlawful an acquisition "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly." 15 USC § 18. Defendants argue that their acquisitions moved the electricity market away from monopoly and, therefore, could not have lessened competition or tended to create a monopoly. In essence, defendants urge the court to hold that acquisitions undertaken in the context of an industry's deregulation cannot violate § 7 of the Clayton Act as a matter of law. Defendants rely on two cases in support of their argument. See *Fraser v. Major League Soccer, LLC*, 284 F.3d 47 (1st Cir. 2002); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir.1981). These cases do not require such a result. Each of these cases involved dismissal of a § 7 claim at the summary judgment stage. In *Fraser*, the district court granted judgment against plaintiffs on their § 7 claim, stating that:

> Where there is no existing market, there can be no reduction in the level of competition. * * * Competition that does not exist cannot be decreased. The creation of the [Major Soccer League] did not reduce competition in an existing market because when the company was formed there was no active market for Division I professional soccer in the United States.

*Fraser v. Major League Soccer, LLC*, 97 F Supp 2d 130, 140–41 (D.Mass.2000). On appeal, the First Circuit upheld the decision, but on much narrower grounds. See *Fraser*, 284 F.3d at 71. In its decision, the First Circuit discussed possible theories under which a § 7 claim might be brought, but found that these theories were incompatible with the jury's determination of other issues in the case. See *id.* at 70–71.

*SCM Corp* is similarly distinguishable. In that case, the Seventh Circuit held that acquisitions of patent rights could not support a § 7 claim. The court relied upon the specific monopoly power that a patentee enjoys as well as a determination that there was no market for the invention at issue before the acquisition.

In addition, here, unlike *SCM Corp* and *Fraser*, before the acquisition there was a market for wholesale electricity; while PG & E was the only market participant in California, the market nonetheless existed.

The court has found no case discussing the potential application of § 7 in the context of deregulation or specifically how acquisition and continued ownership in a newly deregulated industry are to be evaluated for their impact on competition. The court is reluctant to hold, without any factual inquiry, that an acquisition in the process of deregulation cannot lessen competition.

It is, of course, correct that before deregulation, the market in which PG & E operated was not a "competitive" one in the usual sense of that term. As a company operating in a highly regulated industry, PG & E could not exercise market power before deregulation. The highly regulated nature of the prior market should inform the court's determination of the relative competitive forces in the markets at issue here, but that determination should not be made in the factual vacuum of the present record. Cf. *Metro Mobile CTS, Inc. v. NewVector Communications, Inc.*, 892 F.2d 62, 63 (9th Cir.1989) (explaining that courts should focus on commercial realities and directly on a firm's ability to control price or exclude competition); *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) (stating that the regulated nature of the banking industry was relevant to a § 7 determination). A more

complete factual record is necessary before the court should attempt to determine whether a § 7 claim may be stated here.

In addition, the AG relies upon *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), which allows suit under § 7 "even if there was clearly no violation—no realistic threat of restraint of commerce or creation of a monopoly—at the time of the initial acts of acquisition." *Id.* at 241, 95 S.Ct. 926. The AG cites several cases in which continued holding of an asset can be a violation of § 7. Defendants assert that these cases all involve specific anticompetitive activity, such as the creation of barriers to entry or predatory pricing. The court agrees that the AG must allege and prove more than simply that defendants' made the acquisitions at issue, but finds that the AG has met this burden.

■■■ The AG alleges that defendants charged 100% to 200% more than the price they could have charged had the holdings been diversified. See Compl (02–1787: Doc # 1) at ¶ 36; Compl (02–1788: Doc # 1) at ¶ 41. Defendants did this by exploiting their market power. See Compl (02–1787: Doc # 1) at ¶ 35; Compl. (02–1788: Doc # 1) at ¶ 40. These allegations amount to an allegation that defendants had and used market power to control prices. This is sufficient for a § 7 claim based on continued holding of the assets at issue. Monopoly power is the power to exclude competition or control prices. See *United States v. Syufy Enterprises*, 903 F.2d 659, 666 (9th Cir.1990). Allegations of the ability to control prices, therefore, suffice to allege that an acquisition tends toward monopoly.

The AG also alleges, in a conclusory fashion, that defendants are more likely to coordinate pricing, production and withholding of electricity with other electricity generators in the relevant market. See Compl (02–1787: Doc # 1) at ¶ 37; Compl (Doc # 02–1788: Doc # 1) at ¶ 42. The AG alleges no facts, however, which support this conclusory allegation. The allegation adds nothing to the AG's claim.

2

Defendants also assert that the AG has not alleged the relevant market adequately. To support his antitrust claims, the AG "must identify the relevant geographic and product markets * * * and allege facts demonstrating that Defendants' conduct has an anticompetitive effect on those markets." *Big Bear Lodging Assoc. v. Snow Summit, Inc.*, 182 F.3d 1096, 1104–05 (9th Cir.1999).

■■■ In *Mirant*, 02–1787–VRW, the relevant market is defined as: the spot supply of wholesale electricity and reserves in northern California during higher demand. See Compl (02–1787: Doc # 1) at ¶ 31. Similarly, in *Reliant*, 02–1788–VRW, the relevant market is defined as: the spot supply of wholesale electricity and reserves in southern California during higher demand. See Compl (02–1788: Doc # 1) at ¶ 36. In both cases, the AG alleges that this is the appropriate market because of the limited ability to transmit electricity into California or between northern and southern California during periods of high demand. See Compl (02–1787: Doc # 1) at ¶¶ 28–29; Compl (02–1788: Doc # 1) at ¶¶ 33–34. In addition, during periods of high demand, transmission of electricity between northern and southern California is alleged to be impossible. During these high demand periods, there is no substitute for spot electricity and reserves. See Compl (02–1787: Doc # 1) at ¶¶ 30; Compl (02–1788: Doc # 1) at ¶¶ 35.

Contrary to defendants' assertions, *Big Bear* does not require the AG to "explain the basis" for his definition of the relevant market. See *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d

247 (1965) (a complaint alleging the relevant market need not show on the face of the complaint that the market is the proper one). *Big Bear* merely requires that the alleged markets constitute "the [geographic] area of effective competition in which buyers of these products can find alternative sources of supply [and] that there are no other goods or services that are reasonably interchangeable * * * within this geographic market." 182 F.3d at 1105. This the AG has done, and this suffices for pleading purposes although it may well not be sufficient later on a motion for summary judgment.

3

■ Next, the court considers defendants' argument that the AG's § 7 claim is barred by the doctrine of state action. This doctrine insulates a private actor from liability under the federal antitrust statutes if the conduct at issue is a product of a state regulatory program. To be entitled to the doctrine's protection, defendants must demonstrate that (1) the challenged conduct is pursuant to a clearly articulated and affirmatively expressed state policy and (2) the state actively supervises the implementation of that policy. See *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

■ Again, the application of this doctrine in the context of deregulation is a novel question. Defendants assert that their acquisitions were expressly approved by the state regulatory agency, the CPUC, pursuant to a clearly articulated state policy to deregulate California's electricity market. Relying upon *McCaw Personal Communications, Inc. v. Pacific Telesis Group*, 645 F.Supp. 1166 (N.D.Cal.1986), the AG asserts that the doctrine only applies when the state policy displaces competition with regulation; that is, when the state policy fosters anti-competitive conduct. In *McCaw*, the court stated that the

state action doctrine did not apply because defendant "had made no showing that the State of California, through the PUC's review of acquisitions * * * intends to displace competition." *Id.* at 1172. While this requirement is not found in the strict language of the *California Retail Liquor* test, such a requirement is implicit in its reasoning. As the Supreme Court explains, "[t]he [state action] doctrine represents an attempt to resolve conflicts that may arise between principles of federalism and the goal of the antitrust laws, unfettered competition in the marketplace." *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 61, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). If the state policy does not conflict with the goal of the federal antitrust laws, there is no need to apply the doctrine at all.

Thus, defendants have not demonstrated that they are entitled to immunity based on the state action doctrine.

4

■ Finally, the court addresses defendants' argument that the AG's antitrust claims are barred by the Federal Power Act, 16 USC §§ 824 et seq, which grants FERC exclusive jurisdiction over wholesale interstate electricity rates. Defendants contend that they are immune or exempt from federal antitrust laws because Congress intended the FPA to operate exclusively in the realm of wholesale electricity price setting. Because the FPA does not contain any express intent by Congress to exempt otherwise applicable federal antitrust laws, any such exemption must be implied.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 373–75, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), the Supreme Court held that the FPA's extensive regulatory framework did not generally displace federal antitrust laws. The Court reasoned that nothing in the FPA's provisions "was

intended to be a substitute for, or to immunize [defendant] from, antitrust regulation * * *." 410 U.S. at 374–75, 93 S.Ct. 1022. See also *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 596, 96 S.Ct. 3110, 49 L.Ed.2d 1141 n. 35 (1976) ("[T]here can be no doubt about the proposition that the federal antitrust laws are applicable to electrical utilities."). Accordingly, the FPA does not provide blanket immunity against the AG's federal antitrust claims.

██ But the Supreme Court has also held that antitrust claims seeking damages based on a filed rate are prohibited by the filed rate doctrine. See *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 422, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *Keogh v. Chicago & Northwestern R Co,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Insofar as the AG alleges § 7 claims for damages arising out of defendants' "higher energy prices" (02–1787: Doc # 1, ¶¶ 35–36, 46, Prayer for Relief, ¶ 4; 02–1788: Doc # 1, ¶¶ 40–41, 51, Prayer for Relief, ¶ 4), those claims are barred.

The AG's reliance on *Town of Norwood v. New England Power Co.,* 202 F.3d 408 (1st Cir.2000), to rescue his damage claims is misplaced. The court in that case expressly acknowledged that "[d]irect antitrust attacks on federally regulated rates have * * * been limited by the filed rate doctrine." *Id.* at 422. The passage quoted by the AG does not undermine the applicability of the filed rate doctrine to antitrust damages claims, and in light of the Supreme Court's ruling in *Square D,* the court declines to find otherwise.

While the court concludes that the filed rate doctrine bars the AG's claims for damages, that finding does not compel the same result for the AG's injunctive claims for divestiture of the power plants at issue. See *Town of Norwood,* 202 F.3d at 422–23 (explaining that "mergers or sales of assets by federally regulated utilities have

been left open to antitrust challenge even though the resulting rates were subject to federal regulation and even though the merger or sale had been explicitly approved by the regulator"). As the Supreme Court explained in *Square D:*

> *Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation. Such a holding is far different from the creation of an antitrust immunity * * *.

476 U.S. at 422, 106 S.Ct. 1922. Hence, court-ordered divestiture of the assets in question would not offend the filed rate doctrine as it does not "usurp[ ] a function that Congress has assigned to a federal regulatory body." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 582, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981).

*County of Stanislaus v. P G & E,* 114 F.3d 858 (9th Cir.1997), which defendants cite, merely affirms that damage claims under antitrust laws are subject to the filed rate doctrine. It simply does not address the propriety of injunctive relief. See *County of Stanislaus,* 114 F.3d at 860 n. 2 (noting that the parties' claims for injunctive relief are "moot" and "not before us on this appeal").

Thus, the court GRANTS in part and DENIES in part defendants' motions to dismiss in the antitrust cases (02–1787: Doc # 14, 02–1788: Doc # 14). Specifically, the court DISMISSES the AG's claims for damages under the Clayton Act but declines to dismiss his injunctive claims seeking divestiture.

## VI

The court turns to the AG's state law claims contained in all of the related cases. These claims are alleged exclusively under California's unfair competition law, Cal B

& P § 17200. Defendants argue that these claims are barred by the filed rate doctrine and also preempted by the Federal Power Act. In addition, if their motions to dismiss are denied, defendants also move for a stay of these cases under the primary jurisdiction doctrine, pending final resolution of FERC proceedings which address defendants' allegedly unlawful conduct.

### A

"Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, of the United States Constitution." *Transmission Agency of Northern California v. Sierra Pac. Power Co.,* 295 F.3d 918, 928 (9th Cir.2002) (hereinafter *TANC* ), amending and superseding 287 F.3d 771 (9th Cir.2002). "Preemption of state law is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.* (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (internal quotation marks omitted)).

 State law must yield to federal law in three situations. First, state law may be preempted if Congress has expressly so provided. *Gade v. National Solid Wastes Mgm't Ass'n,* 505 U.S. 88, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Second, under field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (citing *Fidelity Fed. Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). Finally, under conflict preemption, "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law * * *

or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (citing *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Defendants contend that field and conflict preemption apply to the instant claims.

### 1

The FPA provides that "the business of transmitting and selling electric energy for ultimate distribution to the public" shall be subject to federal regulation. 16 USC § 824(a). The FPA is clear that the federal government enjoys exclusive regulatory authority over the wholesale transmission and sale of electricity, while states retain regulatory authority over retail sales of electricity. 16 USC §§ 824–824m; *Mississippi Power & Light Co. v. Mississippi ex rel Moore,* 487 U.S. 354, 371–72, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988). Section 824 of the FPA vests regulatory authority in FERC, which has jurisdiction over the sale of electric energy at wholesale in interstate commerce. If a rate is not just and reasonable, or if "any * * * practice, or contract affecting such rate" is not just and reasonable, it is up to FERC to address and remedy the situation in accordance with the statutory procedure defined in 16 USC § 824e.

In the FPA, "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction." *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (quoting *FPC v. Southern Cal. Edison Co.,* 376 U.S. 205, 215–16, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964)). "This was done in the Power Act by making [FERC's] jurisdiction plenary and extending it to all wholesale sales in interstate commerce ex-

cept those which Congress has made explicitly subject to regulation by the States." *Id.* States may not regulate or interfere with "federal authority in the setting of wholesale rates and in the regulation of agreements that affect wholesale rates." *Mississippi Power & Light Co.,* 487 U.S. at 374, 108 S.Ct. 2428. "It is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." *Id.* at 377, 108 S.Ct. 2428 (Scalia, J, concurring). Indeed, "[w]hen Congress has established an exclusive form of regulation, 'there can be no divided authority over interstate commerce.'" *Arkansas Louisiana Gas,* 453 U.S. at 580, 101 S.Ct. 2925 (quoting *Missouri Pacific R Co. v. Stroud,* 267 U.S. 404, 408, 45 S.Ct. 243, 69 L.Ed. 683 (1925)). Accordingly, it is clear that Congress intended the FPA to preempt state law claims in the field of interstate wholesale electricity rate-setting, including practices affecting such rates.

This result is consistent with the Supreme Court's jurisprudence under the Natural Gas Act, which the Supreme Court has held to be "in all material respects substantially identical" to the FPA. Under that act, it is "well settled" that "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 305, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). Indeed, the Supreme Court's self-acknowledged and "established practice of citing interchangeably decisions interpreting the pertinent sections of the [Natural Gas Act and the Federal Power Act]" further bolsters the court's conclusion. *Arkansas Louisiana Gas,* 453 U.S. at 578 n. 7, 101 S.Ct. 2925.

▬ In the instant cases, the AG predicates defendants' alleged violations of California's unfair competition law on (1) defendants' anti-competitive acquisition and holding of certain power plants, which drove up wholesale electricity rates (antitrust cases); (2) defendants' serial failure to file the necessary tariffs with FERC and, when they did file their rates, their overcharges thereunder (failure to file/overcharge cases); and (3) defendants' conduct in connection with their agreement to provide ancillary services, the terms of which were embodied in an ISO tariff (ancillary services cases).

Each type of allegation seeks redress for actions that fall squarely within the field preempted by the FPA. The AG's claims fail because they seek to challenge practices and contracts taken in connection with federal regulations governing the sale of wholesale electricity. As a necessary consequence, the AG attempts to transform California's unfair competition law into a means to regulate conduct that is otherwise regulated by FERC. That the AG seeks to do so on the back of FERC does not afford an avenue to regulate matters that are wholly within FERC's exclusive domain.

The AG's claims would not merely have some undefined "indirect effect on rates," *Schneidewind,* 485 U.S. at 308, 108 S.Ct. 1145. By these claims, the AG seeks to use state law to regulate a field that Congress has set aside exclusively for federal control. "A State must * * * give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Mississippi Power & Light Co.,* 487 U.S. at 373, 108 S.Ct. 2428 (quoting *Nantahala,* 476 U.S. at 965, 106 S.Ct. 2349).

The AG's citation to *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), is unpersuasive because in that case, unlike the case at bar, the Court expressly determined that field preemption did not apply. *Id.* at 256, 104

S.Ct. 615 ("Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents."). In addition, although the Court ultimately declined to find that an award of punitive damages under state law was preempted, the Court rested its decision on its determination that the award of punitive damages for radiation injuries did not hinder accomplishment of the public safety purposes underlying federal nuclear facilities regulation. *Id.* at 256–57, 104 S.Ct. 615. By contrast, the civil penalties that the AG seeks in these actions would interfere with the exclusive authority of FERC over rate-setting.

The AG asserts that the FPA was not meant to interfere with areas traditionally regulated by the states, such as unfair competition. In particular, the AG cites *P G & E Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). In that case, however, the Supreme Court explicitly acknowledged "the broad authority of [FERC] over the need for and pricing of electrical power transmitted in interstate commerce" and distinguished it from other "aspects of electrical generation [that] have been regulated for many years and in great detail by the states." *Id.* at 205–06, 103 S.Ct. 1713. While it may be true that unfair competition is generally an area subject to state regulation, the AG cannot credibly contend that regulation of interstate wholesale electric sales has not been an area of exclusive federal regulation since the FPA's original enactment in 1920 and that has been jealously guarded ever since.

The AG also argues that his claims are not preempted because the FPA does not "occupy the field completely." This argument, however, confuses jurisdictional preemption, as discussed by Judge Whalley in *Hendricks v. Dynegy Power Marketing, Inc.,* 160 F Supp 2d 1155, 1159 (S.D.Cal.

2001), with substantive preemption, which is at issue here. Whether a federal statute "completely preempts" a field of law is pertinent to determining whether claims pled under state law nevertheless provide a federal question basis for removal jurisdiction. *Id.* at 1158. The concept of complete preemption and the cases cited by the AG thereunder are irrelevant to defendants' field and conflict preemption arguments.

### 2

Even if Congress did not intend the FPA to preempt the entire field of interstate wholesale power sales, the AG's claims would be barred by conflict preemption because application of California's unfair competition law would "stand[ ] as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood,* 464 U.S. at 248, 104 S.Ct. 615.

As the court's previous discussion makes clear, Congress intended to draw a "bright line" between state and federal regulation by placing the sale of wholesale electricity, including the rates and any practices affecting such rates, solely within federal control. The Ninth Circuit recently explained that the FPA "delegates to [FERC] the *exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *TANC,* 295 F.3d 918, 928 (9th Cir.2002) (emphasis in original).

Allowing the AG's claims to proceed would impermissibly thwart Congress's objective to divide regulation of electric energy into two distinct spheres and to vest exclusive jurisdiction over the wholesale component in federal hands.

### B

A separate but related doctrine is that of the filed rate. At a high level of generality, the filed rate doctrine strictly

prohibits deviation from the wholesale electricity rates filed with FERC. See *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 250–52, 71 S.Ct. 692, 95 L.Ed. 912 (1951) (applying the filed rate doctrine to the FPA for the first time and explaining its necessity to give effect to Congress's intent). Courts may not effectively substitute their judgments for those of FERC concerning wholesale rate-setting. Id.

Despite its name, the filed rate doctrine is not limited solely to the rates that can be charged, but also bars claims "that concern various nonprice aspects, such as service, provisioning, and billing options" contained within a tariff filed with the agency. *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 222 (2d Cir.2001); see also *TANC*, 295 F.3d at 918.

In the case of state law claims, judicial application of the filed rate doctrine is "a matter of enforcing the Supremacy Clause," *Nantahala*, 476 U.S. at 963, 106 S.Ct. 2349.

> "[T]here can be no divided authority over interstate commerce, and * * * the acts of Congress on that subject are supreme and exclusive." *Missouri Pacific R Co v. Stroud*, 267 U.S. 404, 408 [45 S.Ct. 243, 245, 69 L.Ed. 683] (1925). Consequently, state efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity.

*Nantahala*, 476 U.S. at 964, 106 S.Ct. 2349 (quoting *Chicago North Western Transp. Co. v Kalo Brick & Tile Co.*, 450 U.S. 311, 318–19, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981)).

■ Defendants assert that assessing civil penalties based on these violations would effectively change the just and reasonable rate set by FERC. The AG requests up to $2500 per day as civil penalties for violation of the FPA, either by failing to file rates or by charging unreasonable and unjust rates. This penalty would effectively change the rate set by FERC. See *Arkansas Louisiana Gas*, 453 U.S. at 584, 101 S.Ct. 2925 (prohibiting the award of "what amounts to a retroactive right to collect a rate in excess of the filed rate"); *Day v. AT & T*, 63 Cal.App.4th 325, 74 Cal.Rptr.2d 55, 63 (1998) ("The net effect of imposing any monetary sanction on the respondents will be to effectuate a rebate, thereby resulting in discriminatory rates.").

The AG attempts to avoid the filed rate doctrine's bar by arguing that he does not attack the reasonableness of the filed rate and that calculation of damages and fixed civil penalties will technically not require reference to an alternative court-determined rate. The AG also emphasizes that the relief sought under § 17200 is merely a civil penalty and not a refund; under § 17206(c), half of the civil penalty would go to the state's general fund, with the other half paid to the county in which judgment was entered.

The court's conclusion here, however, is guided and informed by the practical considerations discussed by the Supreme Court in *Arkansas Louisiana Gas*. In that case, the Court applied the filed rate doctrine to bar a breach of contract claim, noting that "permitting this damages award could have an unsettling effect * * * on other gas purchase transactions and would have a potential for disruption of natural gas markets." 453 U.S. at 579, 101 S.Ct. 2925 (internal citations omitted). The Court also incisively noted that any damages paid by defendants could simply be passed along to customers. *Id.* at 579, 101 S.Ct. 2925 n. 10. Here, the relief sought by the AG would impose a substantial monetary sanction on defendants, effectively changing the filed rate and unsettle the markets in ways cautioned against in *Arkansas Louisiana Gas*. Although the

AG questions the continued wisdom of the filed rate doctrine, it is indisputable that the well settled doctrine flows from congressional intent in enacting the FPA itself, to which courts have given effect through strict application of the doctrine. Those substantive provisions have not been altered by Congress, and the court declines the AG's invitation to do so here. See *P G & E v. Lynch,* 216 F Supp 2d 1016, 1039 (N.D.Cal.2002) ("[P]assing fashions in regulatory schemes of the day cannot rework the structure of the regulation established by Congress in the FPA."). The remedies sought by the AG are clearly barred by the filed rate doctrine.

The AG contends that his failure-to-file claims do not run afoul of the filed rate doctrine because, in those instances, there are no filed tariffs to attack at all. The gravamen of these claims is that defendants' failure to file was unfair and "deprived the public, power purchasers, ratepayers, and FERC of notice and information necessary to make informed decisions about rates." See, e g, Compl (02–3041: Doc # 1, Exh A), ¶ 38. On their face, these claims intrude upon FERC's exclusive authority concerning any practice affecting the filed rate. See 16 USC § 824e(a); *TANC,* 295 F.3d at 929–30 (finding "any allocation of power that directly affects rates is protected by the filed rate doctrine"); *ICOM, supra.*

Moreover, the AG's failure-to-file allegations are similar to those considered by the Supreme Court in *Montana–Dakota.* In that seminal case, the Court was confronted by allegations that "some [rate] contracts required by the [FPA] to be filed were not filed at all; that others were filed months late" and that others formed part of a fraudulent scheme. Id at 258, 71 S.Ct. 692 (Frankfurter, J, dissenting). The Court, however, nevertheless found these claims properly dismissed because "the prescription of the statute is a stan-

dard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce." *Id.* at 251, 71 S.Ct. 692. Indeed, the Court left the task of remedying the defendants' alleged violations to FERC. *Id.* at 253, 71 S.Ct. 692.

Nor may the AG evade the filed rate doctrine by explaining that his claims are merely derivative of FERC's determinations, if any, that defendants failed to comply with federal regulations. Defendants' alleged failure to obey FERC's regulatory command undermines, rather than supports, the validity of the AG's claims. See *Mississippi Power & Light Co,* 487 U.S. at 377, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J. concurring) (noting "common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject."); *TANC,* 295 F.3d at 932 (holding that claims falling within the ambit of exclusive federal regulation are preempted by the FPA); *Duke Energy Trading and Marketing, LLC v. Davis,* 267 F.3d 1042, 1057 (9th Cir.2001) (barring state from acting in an area "reserved for exclusive federal jurisdiction" because it "constituted an impermissible intrusion into FERC's territory").

The AG relies primarily on *Brown v. MCI WorldCom Network Svcs. Inc.,* 277 F.3d 1166 (9th Cir.2002) (hereinafter *MCI*) to support his proposition that the filed rate doctrine does not apply to his present claims. In *MCI,* a customer alleged he had been billed for phone service that was never provided. *Id.* at 1171. In that case, which dealt with the Federal Communications Act (FCA), the Ninth Circuit determined that the filed rate doctrine did not apply because the plaintiff was not challenging the tariff's terms, either directly or indirectly. The Ninth Circuit explained that the filed rate doctrine "does not preclude courts from interpret-

ing the provisions of a tariff and enforcing that tariff." Id at 1171–72.

But *MCI* is simply inapposite in the present context. The Ninth Circuit reasoned that the plaintiff could bring suit because application of the filed rate doctrine would have rendered meaningless provisions creating a private right of action in federal court to enforce the FCA. Id at 1172; 47 USC §§ 206–07 (creating private right of action against common carriers who violate the FCA "for the full amount of damages"). Recently, the Ninth Circuit discussed at length the changes in regulatory regimes by Congress's enactment of the Telecommunications Act of 1996, Pub L No 104–104, 100 Stat 5, in *Ting v. AT & T*, 319 F.3d 1126 (9th Cir.2003):

Under the old [telecommunications] regime, * * * [f]ederal law * * * preempted state law. But under the competition-based regime adopted by Congress in 1996, and implemented by the FCC, state law protections are no longer excluded as they once were under the express terms of the filed rate doctrine. Congress recognized as much * * * in the 1996 Act.

*Id.* at 1142–43.

But, under the FPA, which Congress has not seen fit to overhaul, no such right of action exists against electric wholesalers, and the Supreme Court has foreclosed any possibility of recovery in the cases at bar insofar as the AG's claims intrude upon FERC's domain. See *Montana–Dakota*, 341 U.S. at 251, 71 S.Ct. 692 ("[T]he prescription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce.").

Moreover, the AG's attempt to analogize his ancillary services claims with those in *MCI* by arguing that defendants failed to provide contracted services is unpersuasive precisely because the relief sought by the AG would effectively alter the filed tariff. Defendants argue that the tariff at issue provides remedies for its breach and the AG cannot extend those remedies. The AG has alleged that the "ISO's operations are governed by a Tariff and Protocols on file with and approved by [FERC]." Compl (e g, 02–1914: Doc # 1, Exh A, ¶ 26). The tariff provides for the possibility that energy wholesalers would not have reserve capacity when requested. Over a series of amendments to the tariff, FERC approved different payments to wholesalers when they failed to provide reserve capacity as required by contract. *Id.*, ¶¶ 50–53. The parties disagree regarding the interpretation of these amendments and the appropriate payment for reserve capacity. This simply highlights the fact that the AG seeks a determination from this court about the appropriate rates for reserve capacity. This is barred by the filed rate doctrine. The tariff provides for monetary payments for specific services rendered; to require an additional payment would conflict with the tariff. See *Day*, 74 Cal.Rptr.2d at 63.

While the AG's claims may be "consistent" with the ISO tariff insofar as the tariff does not expressly prohibit the additional obligations the AG wishes to impose, they nevertheless seek to alter the effective terms of the filed tariff. Indeed, the AG admits that the conduct for which the AG seeks remedy is addressed by the ISO tariff itself; the AG may not indirectly assault the filed rate by these means.

The AG also contends that the filed rate doctrine does not prohibit the court from affording judicial relief from rates that were obtained through fraud or other unfair tactics. For this proposition, the AG relies primarily on a Fifth Circuit case, *Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465 (5th Cir.1987). In *Gulf States*, the Fifth Circuit held that certain claims brought by a public utility

against electricity wholesalers were not barred by the filed rate doctrine. The parties in that case had entered into a long-term contract for the sale and purchase of agreed-upon quantities of electricity at specified rates, which they filed with FERC. When subsequent market conditions did not match the expectations of one of the parties, the plaintiff brought suit, alleging breach of contract. The Ninth Circuit has limited the Fifth Circuit's holding in *Gulf States;* the Ninth Circuit has stated that "the *quantity* to be purchased was not within the ambit of federal regulation," as opposed to other any other consideration or practice that might affect rates. *TANC,* 295 F.3d at 932 (emphasis added). The conduct at issue in the instant cases, on the other hand, directly concerns rate-setting and filed rates.

Because the AG's state law claims in all of the instant cases are preempted by the FPA and barred by the filed rate doctrine, the court GRANTS defendants' motions to dismiss the AG's state law claims in all of the instant cases (02–1787: Doc # 14; 02–1788: Doc # 14; 02–1791: Doc # 22; 02–1854: Doc # 33; 02–1914: Doc # 10; 02–2061: Docs ## 9,15,29; 02–2207: Docs ## 14,28; 02–2400: Docs ## 9,33,35; 02–3036: Doc # 6; 02–3040: Doc # 6; 02–3041: Doc # 6;. 02–3042: Doc # 6; 02–3127: Docs ## 11,20; 02–3318: Docs ## 3,22) and dismisses these claims with prejudice.

## VII

In summary, the court DENIES the AG's motions to remand in the recently related cases (02–2400: Doc # 13; 02–3036: Doc # 16; 02–3040: Doc # 26; 02–3041: Docs ## 16,34; 02–3042: Doc # 25; 02–3127: Docs ## 15,16; 02–3311: Docs ## 12,14; 02–3318: Docs ## 9,21), GRANTS in part and DENIES in part defendants' motions to dismiss in the antitrust cases (02–1787: Doc # 14; 02–1788: Doc # 14), GRANTS defendants' motions to dismiss in the failed to file/overcharge cases, with the exception of BP Energy, which did not file a motion to dismiss, (02–2061: Docs ## 9,15,29; 02–2207: Docs ## 14,28; 02–2400: Docs ## 9,33,35; 02–3036: Doc # 6; 02–3040: Doc # 6; 02–3041: Doc # 6; 02–3042: Doc # 6; 02–3127: Docs ## 11,20; 02–3318: Docs ## 3,22), and GRANTS defendants' motions to dismiss in the ancillary services cases (02–1791: Doc # 22; 02–1854: Doc # 33; 02–1914: Doc # 10). Dismissal of these claims is with prejudice. Accordingly, the clerk is directed to close the files, terminate all pending motions and enter judgment for defendants in the following cases: *People v. Reliant,* Case No 02–1791–VRW; *People v. Dynegy,* Case No 02–1854–VRW; *People v. Mirant,* Case No 02–1914–VRW; *People v. Reliant,* Case No 02–2061–VRW; *People v. Mirant,* Case No 02–2207–VRW; *People v. Coral,* Case No 02–2400–VRW; *People v. Puget Sound,* Case No 02–3036–VRW; *People v. Transalta Energy,* Case No 02–3040–VRW; *People v. Tucson Electric,* Case No 02–3041–VRW; *People v. Idaho Power,* Case No 02–3042–VRW; *People v. Merrill Lynch Capital,* Case No 02–3127–VRW; *People v. Portland General Electric,* Case No 02–3318–VRW; and *People v. Transcanada Power,* Case No 02–3731–VRW.

Upon entry of this order, only three cases remain pending before the court: (1) *People v. BP Energy,* Case No 02–3311–VRW, in which the parties have agreed to extend the time for BP Energy to answer or otherwise respond to the complaint until after the court ruled on the AG's motion to remand; and (2) the antitrust cases, *People v. Mirant,* Case No 02–1787–VRW, and *People v. Reliant,* Case No 02–1788–VRW, in which only the AG's Clayton Act claim for the divestiture of certain power facilities remains. A case management conference in the antitrust cases is hereby set for April 3, 2003, at 3:30pm.

As an administrative matter, the court TERMINATES as moot the motions related to the AG's prior efforts to stay defendants' motions to dismiss until the court ruled on the AG's motions to remand (02–1914: Docs ## 24, 39, 42; 02–2061: Docs ## 21, 22; 02–2207: Docs ## 21, 22). The court denied remand in these cases by order dated August 6, 2002.

IT IS SO ORDERED.